# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| YOUNG WOMEN'S CHRISTIAN ASSOCIATION OF ROCHESTER AND MONROE COUNTY,<br><br>    Plaintiff,<br><br>    v.<br><br>HATTERAS FUNDS, LP, HATTERAS INVESTMENT PARTNERS, LP, DAVID B. PERKINS, H. ALEXANDER HOLMES, STEVEN E. MOSS, GREGORY S. SELLERS, THOMAS MANN, BENEFICIENT, and BRADLEY K. HEPPNER,<br><br>    Defendants,<br><br>    and.<br><br>HATTERAS MASTER FUND, L.P. and HATTERAS CORE ALTERNATIVES TEI INSTITUTIONAL FUND, L.P.,<br><br>    Nominal Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 2024-1264-JTL |

## OPINION ADDRESSING RULE 12(B)(6) MOTION

Date Submitted: December 5, 2025
Date Decided: March 27, 2026

William M. Alleman, Jr., MELUNEY ALLEMAN & SPENCE, LLC, Lewes, Delaware; Aaron T. Morris, Andrew W. Robertson, William H. Spruance, MORRIS KANDINOV LLP, New York, New York; *Attorneys for Plaintiff.*

Elena C. Norman, Richard J. Thomas, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Melanie B. Dubis, Corri A. Hopkins, PARKER POE ADAMS & BERNSTEIN LLP, Raleigh, North Carolina; *Attorneys for Defendants David B. Perkins and Hatteras Investment Partners, LP (f/k/a Hatteras Funds, LP).*

Stephen B. Brauerman, Brett M. McCartney, BAYARD, P.A., Wilmington, Delaware; Joshua L. Solomon, Phillip Rakhunov, POLLACK SOLOMON DUFFY LLP, Boston, Massachusetts; *Attorneys for Defendants H. Alexander Holmes, Steven E. Moss, Gregory S. Sellers, and Thomas Mann.*

Stephen C. Norman, Ellis H. Huff, Samuel G. Gustafson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Defendant Beneficient*

Bradley K. Heppner, Dallas, Texas; *Defendant, Pro Se*

Scott J. Leonhardt, Jared T. Green, Katherine R. Welch, ESBROOK P.C., Wilmington, Delaware; Jennifer K. Van Zant, Greg Gaught, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD LLP, Raleigh, North Carolina; *Attorneys for Nominal Defendants Hatteras Master Fund, L.P. and Hatteras Core Alternatives TEI Institutional Fund, L.P.*

**LASTER, V.C.**

An investment manager oversees a group of investment funds (the "Investment Manager"). The principal investment fund is organized as a Delaware limited partnership and provides access to alternative investments through a fund-of-funds strategy (the "Master Fund"). One of its fundamental investment policies requires maintaining diversification by prohibiting the Master Fund from investing more than 25% of its assets in a single issuer (the "Diversification Policy").

The Master Fund does not accept investments directly from third-party investors. It uses a master-feeder structure in which feeder funds (the "Feeder Funds") raise capital and channel it into the Master Fund.[1] The Master Fund and the Feeder Funds have substantially identical limited partnership agreements. An affiliate of the Investment Manager serves as the general partner of each fund, but delegates its managerial authority over the business and affairs of the fund to a board of directors (the "Board" or the "Directors"). The limited partnership agreements provide that the Directors owe the same fiduciary duties as directors of a Delaware corporation. Rather than fully exculpating the Directors from liability for breaches of duty, the limited partnership agreements preserve liability for gross negligence.

After an initial period of success during which assets under management ("AUM") grew dramatically, the Master Fund experienced a similarly lengthy period

---

[1] *See* Henry Ordower, *Demystifying Hedge Funds: A Design Primer*, 7 U.C. Davis Bus. L.J. 323, 343–45 (2007) (describing master-feeder structure); *Fund Director's Guidebook*, 52 Bus. Law. 229, 252–53 (1996) (same).

of withdrawal requests. The Investment Manager met those requests by having the Feeder Funds engage in periodic tender offers.

By 2021, the Master Fund's AUM had fallen by half. The Investment Manager's fees had fallen even further, and because of a high-watermark limitation on its performance fee, the Investment Manager was unlikely to see any performance fees for years to come. The Investment Manager decided to wind down the Master Fund and start over with a new fund.

To achieve that goal, the Investment Manager entered into a transaction with a startup fund-advisory firm (the "Buyer") that focused on helping investment managers address liquidity issues. In the resulting transaction, the Investment Manager sold all of the Master Fund's assets to the Buyer (the "Asset Sale"). In return, the Master Fund received illiquid (and inferably overvalued) limited partner units in the Buyer (the "Preferred Units"). The Buyer also promised to provide financial support for the Investment Manager's future funds.

In substance, the Master Fund purchased a single security—the Preferred Units—in return for its diversified pool of assets. The closing of the Asset Sale resulted in the Master Fund violating the Diversification Policy by concentrating 100% of its AUM in a single security. But the Asset Sale conferred a unique benefit on the Investment Manager in that it converted the Master Fund's AUM into a form of round-trip financing for future funds.

And there was more. Red flags aplenty waved around the Buyer. Its CFO had resigned over concerns about interested transactions. Two audit firms had

2

terminated their engagements. Four independent directors had resigned. The Security and Exchange Commission was investigating the firm's accounting practices. And goodwill arising from the interested transactions comprised 88% of the assets on its balance sheet.

When the Investment Manager presented the Asset Sale to the Board, the Directors approved it immediately. They did not receive a fairness opinion or consult with any outside advisors. After the Asset Sale closed, the Directors allowed the Investment Manager to send belated and misleading communications to the Feeder Fund investors.

The Board ostensibly approved the Asset Sale as part of a plan of liquidation for the Master Fund and its feeder funds (the "Dissolution Plan"). Yet after the Asset Sale, the Directors and the Investment Manager did not take any steps to pursue the Dissolution Plan. They also did not take any steps to protect the Master Fund against loss from its now-single investment in the Preferred Units.

Eighteen months later, the Buyer completed a de-SPAC transaction that converted the Preferred Units into publicly traded common stock valued at $8 per share. Although the Master Fund now held a liquid security, the Directors and the Investment Manager did not take any steps to diversify the Master Fund's assets, wind down its operations, or protect the Master Fund against loss from its singular investment.

In the months following the de-SPAC transaction, the Buyer wrote off the bulk of its goodwill. Its stock price plummeted, ultimately trading for pennies. The Master

3

Fund still has not sold any of the Buyer's shares. The Master Fund's AUM has fallen by 98%, with Feeder Fund investors bearing those losses.

Meanwhile, during the time that the Investment Manager and the Directors did nothing, the Master Fund continued to pay the Investment Manager an annual fee equal to 1% of its AUM, even though the Master Fund had gone from holding over 100 different funds to owning a single security. That arrangement yielded over $10 million for the Investment Manager.

One of the investors in a Feeder Fund asserted double-derivative claims on behalf of the Master Fund. The plaintiff claims that the Directors and the Investment Manager breached their fiduciary duties by (i) approving the Asset Sale, (ii) failing to pursue the Dissolution Plan, and (iii) allowing the Investment Manager's advisory agreement to renew each year without any change in the Investment Manager's annual fee to reflect the Master Fund's dramatically different situation. The plaintiff also claims that the Buyer and its CEO aided and abetted the Directors and Investment Manager in breaching their fiduciary duties in connection with the Asset Sale.

The outside directors, the Buyer, and its CEO moved to dismiss the claims against them, contending that the allegations failed to state claims on which relief can be granted. At the pleading stage, the complaint states claims on which relief can be granted against the outside directors and the Buyer. It does not state a claim on which relief can be granted against the Buyer's CEO.

# I. FACTUAL BACKGROUND

The facts are drawn from the amended complaint (the "Complaint"), documents the Complaint incorporates by reference, and documents subject to judicial notice.[2] At this procedural stage, the court must credit the Complaint's well-pled allegations and draw all reasonable inferences in the plaintiff's favor.

## A. The Fund Complex

The fund complex at the center of the case does business under the "Hatteras" trade name. In 2003, David B. Perkins cofounded the fund complex with the goal of establishing funds that would provide investors with access to alternative investment strategies—think of hedge funds and private equity funds—through a fund-of-funds approach. By pooling their capital through a fund of funds, smaller investors could attain levels of diversification similar to what larger investors could achieve.

The central management entity in the fund complex is the Investment Manager, formally known as Hatteras Funds, LP and now doing business as Hatteras Investment Partners, LP.[3] Perkins controls the Investment Manager, owns a majority of its equity, and serves as its President and CEO.

---

[2] Citations in the form "Compl. ¶ ___" refer to paragraphs of the amended complaint, which is the operative pleading. Dkt. 29, Ex. 1. Citations in the form "HX ___ at ___" refer to exhibits to the transmittal affidavit of Richard J. Thomas. Dkts. 29, 30. Citations in the form "BX ___ at ___" refer to exhibits to the motion to dismiss filed by the Buyer and its CEO. Dkt. 34. Page references cite to internal pagination whenever possible.

[3] *See* HX 2 (the "Prospectus") at 24. The caption names Hatteras Funds LP and Hatteras Investment Partners, LP as two separate entities, but they seem to be one

The fund complex's principal investment vehicle is the Master Fund, formally known as the Hatteras Master Fund, L.P. The Master Fund's investment goal is "to provide capital appreciation consistent with the return characteristics of the alternative investment portfolios of larger institutions . . . . [and] to provide capital appreciation with less volatility than that of the equity markets."[4] The Master Fund told its investors that to achieve its investment goal, it typically would invest in approximately fifty different alternative investment products. At the time of the Asset Sale, the Master Fund had investments in around 125 different alternative investment products.

The Master Fund implemented its commitment to diversification through the Diversification Policy. That policy prohibits the Master Fund from investing "25% or more of the value of its total assets in the securities . . . of any one issuer."[5]

The Master Fund is a Delaware limited partnership, and is internal affairs are governed by its limited partnership agreement (the "LP Agreement"). An affiliate of the Investment Manager serves as the Master Fund's general partner,[6] but under the

---

in the same. Public filings like the Prospectus indicate that Hatters Funds LP conducted business for period as Hatteras Investment Partners, then changed its name to Hatteras Investment Partners, L.P. The complaint treats them as the same entity. So does the briefing. This decision takes that approach.

[4] *See* Prospectus at 27; *see also id.* at 19.

[5] Compl. ¶ 38; *see also* Prospectus, Statement of Additional Information at 2.

[6] Formally, the general partner is Hatteras Investment Management LLC. *See* LP Agreement (cited as "LPA") art. I. The distinction between that entity and the

LP Agreement, the general partner has irrevocably delegated its rights and powers to manage the business and affairs of the Master Fund to the five-member Board. Perkins serves as Chair. The other Directors are H. Alexander Holmes, Steven E. Moss, Gregory S. Sellers, and Thomas Mann (the "Outside Directors").

None of the Outside Directors have affiliations with the fund complex other than through their directorships. But, as discussed later, they have served in their positions for decades and benefit from their association with Perkins and the Investment Manager.

---

Investment Manager is not important at this stage of the proceeding. *See In re USACafes, L.P. Litig.*, 600 A.2d 43, 47–48 (Del. Ch. 1991) (Allen, C.) (extending fiduciary duties to parties that controlled affiliate serving as general partner); *see also In re Ezcorp Inc. Consulting Agreement Deriv. Litig.,* 2016 WL 301245, at *9 (Del. Ch. Jan. 25, 2016) ("An ultimate human controller who engages directly or indirectly in an interested transaction with a corporation is potentially liable for breach of duty, even if other corporate actors made the formal decision on behalf of the corporation, and even if the controller participated in the transaction through intervening entities."); *see generally S. Pac. Co. v. Bogert*, 250 U.S. 483, 488 (1919) (Brandeis, J.) ("The Southern Pacific contends that the doctrine under which majority stockholders exercising control are deemed trustees for the minority should not be applied here, because it did not itself own directly any stock in the old Houston Company; its control being exerted through a subsidiary, Morgan's Louisiana & Texas Railroad & Steamship Company, which was the majority stockholder in the old Houston Company. But the doctrine by which the holders of a majority of the stock of a corporation who dominate its affairs are held to act as trustee for the minority does not rest upon such technical distinctions. It is the fact of control of the common property held and exercised, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation.").

Another affiliate of the Investment Manager serves as the Master Fund's investment advisor under a fund advisory agreement (the "Advisor Agreement").[7] The Advisor Agreement requires that the Investment Manager develop and monitor an investment program for the Master Fund. That task involves determining "what investments shall be purchased, held, sold or exchanged by the Master Fund and what portion, if any . . . shall be held uninvested . . . ."[8] The Advisor Agreement empowers the Investment Manager to "make changes in the investments of the Master Fund,"[9] subject to Board oversight and fundamental investment policies like the Diversification Policy.

The Advisor Agreement provides for both an annual fee and a performance fee. The Investment Manager receives an annual fee equal to 1.00% of the Master Fund's net AUM (the "Annual Fee"). The Investment Manager receives a performance fee equal to 10% of the amount by which the Master Fund's net profits exceed the yield-to-maturity of treasury bills (the "Performance Fee"). The Performance Fee incorporates a high-watermark mechanism, meaning if the Master Fund suffers a net loss in any period, the Investment Manager must recover the loss before receiving

---

[7] Formally, the investment advisor is Hatteras Investment Partners LLC. LPA art. 1. Under the same authorities discussed in the preceding footnote, the distinction between that entity and the Investment Manager is not important at this stage of the proceeding.

[8] Compl. ¶ 45.

[9] *Id.*

any additional Performance Fees. Because of the amount of losses the Master Fund has suffered, the Investment Manager is unlikely to see any Performance Fees for the foreseeable future.

The Investment Manager engaged Portfolio Advisors, LLC, a non-party, as a sub-adviser to assist in identifying and monitoring alternative investment providers. For its services, Portfolio Advisors receives a portion of the Annual Fee and any Performance Fees.

## B.    The Feeder Funds

The Master Fund does not raise capital directly. The Master Fund and the Investment Manager instead use a common fund-industry structure in which feeder funds channel capital into the Master Fund.

Four Delaware limited partnerships serve as the Feeder Funds for the Master Fund. Each invests all of its assets in the Master Fund.

Each Feeder Fund has the same governance structure as the Master Fund, including the same general partner (the Investment Manager), the same investment advisor (the Investment Manager), and the same board of directors (the Board). Each has the same investment objectives and fundamental policies as the Master Fund, including the Diversification Policy.

The four Feeder Funds come in two pairs. One pair targets investors generally and consists of the Hatteras Core Alternatives Fund, L.P. and the Hatteras Core Alternatives TEI Fund, L.P. (the "Original Feeder Funds"). A second pair targets institutional investors and consists of the Hatteras Core Alternatives Institutional

9

Fund, L.P. and the Hatteras Core Alternatives TEI Institutional Fund, L.P. (the "Institutional Feeder Funds").

The two "TEI" funds are for tax-exempt investors. They invest in the Master Fund through intervening off-shore blocker entities designed to prevent the tax-exempt funds from accumulating unrelated business income. The offshore blocker entities in turn invest all of their assets in the Master Fund. The blocker entities have no investment discretion and make no independent decisions. For purposes of legal analysis, the parties ignore the blocker entities. So does this decision.

The following diagram from the Prospectus depicts the basic fund structure:



The Master Fund and the Feeder Funds are registered as closed-end, diversified, investment management companies under the Investment Company Act of 1940 (the "1940 Act"). The Feeder Funds' status as close-end funds means that

investors have minimal liquidity opportunities. In an open-end fund, an investor can redeem its units at the end of each trading day at the fund's net asset value. Not so in a closed-end fund. Many closed-end funds mitigate that limitation by listing their limited partnership interests, known as units, on a public exchange. The Feeder Funds' units do not trade publicly, nor are their units freely transferrable.

The only meaningful opportunity for liquidity that Feeder Fund investors had was to ask to have their units repurchased. To address repurchase requests, the Investment Manager historically caused the Feeder Funds to make periodic tender offers for units, usually quarterly. The Investment Manager determined when to make a tender offer and how many units to repurchase, although always less than 20% of the units outstanding. Typically, the Investment Manager capped the number of units accepted for repurchase at 5% of the outstanding units. If investors tendered more, then the repurchases were prorated. Because of the limit on repurchases and the reality of proration, it could take multiple quarters for an investor to exit.

## C.     The Road To The Asset Sale

The Investment Manager launched the Master Fund and the Original Feeder Funds in 2003. The Investment Manager added the Institutional Feeder Funds in 2007. AUM grew rapidly, peaking in 2013 at more than $624 million. The Investment Manager's fees grew as well, topping $15.2 million.

After 2013, the flow of investment dollars reversed. The Master Fund experienced a steady stream of tender requests as investors sought to exit. Because of the Master Fund's fund-of-funds structure, the tender requests created liquidity

11

pressure. Investments in alternative fund providers are illiquid, so the Master Fund could not readily sell investments to generate capital for the tender offers.

By 2020, AUM had fallen by more than half. The Investment Manager's fees had fallen even further to around $3.9 million per year. With tender requests continuing, Perkins decided to shut down the existing funds and start over with new funds. Ideally, however, he would use the Master Fund's remaining AUM—valued at approximately $305 million—to seed the new funds.

The solution came through a transaction with the Buyer, then known formally as The Beneficient Company Group, L.P. It, too, was a Delaware limited partnership. Bradley K. Heppner is its founder, Chief Executive Officer, and Chairman.

The Buyer provides liquidity solutions for illiquid alternative investments— exactly what Perkins needed. At the time, however, the Buyer was still a startup. It had only been in business for four years and was not yet profitable. The Buyer also did not expect to generate positive cash flow from its operations in the near term. It needed capital to expand.

Much of the Buyer's value was attributable to goodwill. Its financial statements for 2020 identified $2.82 billion in total assets. Goodwill accounted for $2.36 billion, or 84%.

That goodwill largely resulted from a series of interested transactions between the Buyer and GWG Holdings, Inc., its former parent. GWG specialized in selling bonds backed by life settlements. Between 2017 and 2020, the Buyer and GWG

12

engaged in a series of transactions that resulted in the Buyer and GWG inverting their relationship. After those transactions, the Buyer controlled GWG.

The GWG transactions raised red flags. In July 2019, the Buyer's CFO resigned and expressed concern that Heppner was using the GWG transactions to misappropriate funds. In October 2019, four outside directors who served on both the Buyer and GWG boards resigned after objecting to the GWG transactions. During that year, two successive audit firms terminated their engagements. In October 2020, the SEC's Division of Enforcement subpoenaed GWG's documents as part of an investigation into its accounting practices, including the consolidation of GWG's financial statements with the Buyer's and the legitimacy of the goodwill valuation. In response to the SEC investigation, GWG issued a statement expressing substantial doubt about its ability to continue as a going concern. GWG also announced that its prior financial reports should not be relied upon and that it would restate its financials for 2019 and three quarters of 2020.

## D.    The Asset Sale

Despite the red flags surrounding the Buyer, the Investment Manager negotiated the Asset Sale. In that transaction, the Buyer acquired all of the Master Fund's assets, comprising approximately $305 million in diversified holdings. In return, the Master Fund received Preferred Series B-2 units in the Buyer. In addition, the Buyer agreed to support the Investment Manager by providing seed capital for

13

new funds.[10] Ironically, the strength of the assets the Buyer acquired in the Asset Sale would help underwrite that support. The Asset Sale thus enabled the Investment Manager to round-trip the Master Fund's AUM and use it to seed new investment funds.

On December 7, 2021, the Investment Manager presented the Asset Sale to the Board for the first time. The Investment Manager pitched the transaction as the first step in the Dissolution Plan that would result in the Master Fund dissolving and returning capital to investors. The Board approved the Asset Sale that same day. The Board did not secure a fairness opinion or consult with outside advisors.

The Asset Sale dramatically changed the composition and risk profile of the Master Fund's investments. Before the Asset Sale, the Master Fund held a range of alternative investments managed by advisors who employed diverse strategies across different industries and asset classes. After the Asset Sale, the Master Fund held limited partnership units in a single entity—the Buyer—with an unproven track record and a host of red flags. The Preferred Units were not a liquid investment; they would only convert into salable equity upon an "initial listing event," defined as a public offering or merger with a public company.[11] The Board and the Investment Manager had no control over when—if ever—the Buyer would engage in an initial listing event.

_____

[10] *Id.* ¶¶ 4, 69, 87.

[11] BX B at 5.

14

The Asset Sale violated the Diversification Policy, which prevented the Master Fund from investing more than 25% of its AUM in a single security. The Board could only approve a departure from the Diversification Policy with supermajority unitholder approval. The Board did not seek unitholder approval for the Asset Sale or for the departure from the Diversification Policy. The Investment Manager also did not announce that it was exploring alternatives or give investors a chance to tender their units before the Board approved the Asset Sale. After approving the Asset Sale, the Board cancelled all pending tender requests.

**E.      Investors Learn About The Asset Sale.**

On December 30, 2021, the Investment Manager sent a letter describing the Asset Sale to the Feeder Fund investors. The letter asserted that that the Investment Manager needed to generate liquidity after receiving a "large number of [requests from] investors who want to tender their investment in the [Feeder Funds]."[12] The Investment Manager claimed to have considered "multiple options to provide liquidity for investors who want out" and to have concluded there were "two viable approaches: convert the existing Fund or start a new Fund."[13]

The letter next reported that the Investment Manager was pursuing both approaches by entering into "a plan of liquidation" under which a "large institutional

---

[12] *Id.* ¶ 78.

[13] *Id.* ¶¶ 77–78.

investor" would "buy 100% of [the Master Fund's] assets."[14] Read in context, that statement implied that a blue-chip institutional investor was buying the Master Fund's assets for cash and that the Master Fund would dissolve and return cash to its investors. The letter did not accurately describe the Buyer or explain that the Master Fund was accepting consideration in the form of the Preferred Units. The letter did not disclose that the Buyer had agreed to provide financial support for the Investment Manager's future funds.

For the next eighteen months, the Investment Manager and the Board did nothing to pursue the Dissolution Plan, diversify the Master Fund's holdings, correct the violation of the Diversification Policy, or otherwise address the risks posed to the Funds from holding a single illiquid security in an unproven issuer surrounded by red flags. The Master Fund simply held the Preferred Units.

### F. The Avalon Transaction

On September 21, 2022, the Buyer announced that it had agreed to a de-SPAC transaction with Avalon Acquisition, Inc., a special purpose acquisition vehicle (the "Avalon Transaction"). The Buyer would emerge from the Avalon Transaction as a publicly traded corporation organized under Nevada law. As part of the Avalon Transaction, the Preferred Units that the Master Fund held would convert into shares of the Buyer's common stock valued at $8 per share.

---

[14] *Id.* ¶ 80.

On December 9, 2022, the Investment Manager sent another letter to the Feeder Fund investors. This letter explained for the first time that the Master Fund had exchanged its investments for the Preferred Units. The letter included a set of "frequently asked questions" which represented that the concentrated position in the Preferred Units was an "intermediate step" toward liquidity.[15]

The letter also referenced the Avalon Transaction, describing it as a "liquidity event."[16] But the letter did not explain that the Preferred Units would convert into publicly traded shares of the Buyer's common stock, rather than cash.

The Avalon Transaction closed on June 8, 2023, and the Master Fund's Preferred Units converted into the Buyer's common stock. The Master Fund now had a liquid security that it could sell or distribute to wind down the Master Fund and Feeder Funds.

The Investment Manager sent a third letter to the Feeder Fund investors. This letter reported that the Preferred Units had been exchanged for common stock in the Buyer valued at $8 per share.

## G. The Buyer's Stock Plummets In Value.

After the Avalon Transaction closed, the Investment Manager did not diversify its holdings. The Master Fund continued to hold only the Buyer's common stock.

---

[15] *Id.* ¶ 107.

[16] *Id.* ¶ 108.

17

On August 14, 2023, the Buyer issued its first Form 10-Q after the Avalon Transaction. In its financial statements, the Buyer wrote down the value of its goodwill—by far the largest asset on its balance sheet—from $2.37 billion to $1.27 billion. In the next quarter, the Buyer wrote down its goodwill by another $306.7 million. In the next quarter after that, the Buyer wrote down its good will by another $883.2 million. During its first seven months as a public company, the Buyer wrote off almost all of the $2.37 billion in goodwill, retaining only $81.7 million.

The Buyer's stock price plummeted from the $8 per share valuation used in the de-SPAC transaction. By October 2023, the stock had fallen to under $0.60 per share. By April 2024, the stock had fallen below $0.05 per share.

Facing delisting because of its failure to meet Nasdaq's $1.00 minimum trading price requirement, the Buyer conducted a 1-for-80 reverse stock split on April 18, 2024. By December 2, 2024, the Buyer's stock had traded down to $0.83 per share, representing a 99.88% loss from the $8 valuation used in the de-SPAC transaction. Adjusting for the reverse stock split, the Buyer's stock was trading for pennies per share.

Even as the Buyer's stock price plummeted, the Investment Manager and the Directors failed to take any steps to diversify the Master Fund's position and protect against losses. The Investment Manager and the Directors also did not take any steps to pursue the Dissolution Plan, such as by distributing the Buyer's common stock up through the Feeder Funds to their investors. Had they done so, investors could have decided for themselves whether to sell.

18

To date, the Master Fund has yet to liquidate. The Investment Manager has no apparent plans to do so.

## H.     The Master Fund Keeps Paying The Annual Fee.

After the Asset Sale, the scope of the Investment Manager's duties narrowed dramatically. Before the Asset Sale, the Investment Manager was overseeing a portfolio of approximately 125 alternative investment managers. The Investment Manager also had to consider the liquidity needs of Feeder Fund investors and manage periodic tender offers.

After the Asset Sale, the Master Fund held all of its AUM in a single, illiquid security. There were no alternative investment managers or tender offers to oversee.

Because the Advisor Agreement renewed annually, the Board could have taken steps to renegotiate the Investment Manager's fees. The Board opted not to renegotiate and allowed the Advisor Agreement to renew annually on the same terms.

## I.     This Litigation

The Young Women's Christian Association of Rochester and Monroe County (the "YWCA") is a non-profit organization that provides essential services and policy advocacy to support women, children, and families. The YWCA has been a beneficial owner of units in the tax-exempt Institutional Feeder Fund since 2012.

The YWCA filed this lawsuit on December 6, 2024. The YWCA asserts seven claims on behalf of the Master Fund. All are double-derivative claims, meaning the YWCA is initially asserting its right to sue derivatively on behalf of the tax-exempt Institutional Feeder Fund.

19

On January 10, 2025, the defendants removed the suit to the United States District Court for the District of Delaware. The YWCA filed an amended complaint that eliminated the basis for federal jurisdiction. The district court remanded the case, and the parties agreed to use that pleading as the Complaint.

Count I asserts that the Directors breached their fiduciary duties by approving the Asset Sale, then failing to pursue the Dissolution Plan. Count I also asserts that the Directors breached their fiduciary duties by allowing the Advisor Agreement to renew without renegotiating the Annual Fee.

Count II asserts that the Investment Manager breached its fiduciary duties by engaging in the same conduct.

Count III asserts that the Investment Manager breached the Advisor Agreement by failing to provide and oversee an investment program after the Asset Sale.

Count IV asserts that Perkins and the Investment Manager were unjustly enriched by continuing to receive the same Annual Fee after the Asset Sale.

Count V asserts a claim for fraud against the Buyer and Heppner based on false and misleading information allegedly provided during the negotiation of the Asset Sale.

Count VI asserts that the Buyer and Heppner aided and abetted the Directors and Investment Manager in breaching their duties.

Count VII asserts that the Buyer and Heppner were unjustly enriched through the Asset Sale and the Avalon Transaction.

20

The defendants moved to dismiss all of the claims on a variety of grounds, including Rule 12(b)(6). The Outside Directors moved to dismiss Count I under Rule 12(b)(6) as failing to state a claim on which relief can be granted. The Buyer and Heppner moved to dismiss Counts V, VI, and VII on the same basis. Perkins and the Investment Manager did not move to dismiss Counts I, II, III, or IV under Rule 12(b)(6).

On December 5, 2025, the court dismissed Count V. This decision addresses the Rule 12(b)(6) motions.

## II. LEGAL ANALYSIS

When considering a Rule 12(b)(6) motion, "a trial court should accept all well-pleaded factual allegations in the Complaint as true" and "draw all reasonable inferences in favor of the plaintiff."[17] The court should "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[18] The "conceivability" standard "is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'"[19]

---

[17] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[18] *Id*.

[19] *Id*. at 537 n.13.

21

Under a notice pleading standard, a court should "accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim."[20] But Delaware courts take a stricter approach when evaluating investor claims that could impose asymmetric costs and thus carry significant settlement value if they survive a pleading-stage motion. In that setting, a plaintiff must plead "specific facts" and cannot rely on "conclusory allegations."[21] In addition, "the trial court is not required to accept every strained interpretation of the allegations proposed by the plaintiff," but only "reasonable inferences that logically flow from the face of the complaint."[22]

---

[20] *Id.*

[21] *See Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) ("We decline . . . to accept conclusory allegations unsupported by specific facts . . . ."); *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) ("We do not . . . blindly accept conclusory allegations unsupported by specific facts . . . ."); *Gantler v. Stephens*, 965 A.2d 695, 704 (Del. 2009) (same); *Feldman v. Cutaia*, 951 A.2d 727, 731 (Del. 2008) (stating that "conclusory allegations need not be treated as true"); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) ("A trial court is not . . . required to accept as true conclusory allegations without specific supporting factual allegations." (internal quotation marks omitted)); *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38 (Del. 1996) ("[C]onclusions . . . will not be accepted as true without specific allegations of fact to support them." (internal quotation marks omitted)). Some decisions even cite derivative action precedents when framing the Rule 12(b)(6) pleading standard. *E.g.*, *In re Nat'l Auto Credit, Inc. S'holders Litig.*, 2003 WL 139768, at *12 (Del. Ch. Jan. 10, 2003) (citing *Grobow v. Perot*, 539 A.2d 180, 187–88 & n.6 (Del. 1988), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)); *Cal. Pub. Emps.' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *15 (Del. Ch. Dec. 18, 2002) (same).

[22] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001); *accord Page v. Oath Inc.*, 270 A.3d 833, 842 (Del. 2022); *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine P'rs 2006, L.P.*, 93 A.3d 1203, 1205 (Del. 2014); *Gen. Motors*, 897 A.2d at

22

## A. Count I: Breach Of Fiduciary Duty Against The Directors

Count I asserts that the Directors breached their fiduciary duties by approving the Asset Sale, by failing to pursue the Dissolution Plan after the Asset Sale, and by not renegotiating the Investment Manager's Annual Fee.[23] The Outside Directors moved to dismiss this count, but it states a claim against them.

### 1. The Elements Of A Claim For Breach Of Fiduciary Duty

A claim for breach of fiduciary duty is an equitable tort.[24] The basic elements of a common-law tort are familiar: The plaintiff must prove the existence of a duty, a breach of that duty, injury, and a causal connection between the breach and an injury that is sufficient to warrant a remedy, such as compensatory damages.

The equitable tort for breach of fiduciary duty has only two formal elements: (i) the existence of a fiduciary duty and (ii) a breach of that duty.[25] The first element

---

168; *see Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013) ("We do not, however, credit conclusory allegations that are not supported by specific facts, or draw unreasonable inferences in the plaintiff's favor.").

[23] Compl. ¶ 169.

[24] *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *54 (Del. Ch. July 12, 2010) ("A breach of fiduciary duty is easy to conceive of as an equitable tort . . . ."); *see* Restatement (Second) Torts § 874 cmt. b (Am. L. Inst. 1979), Westlaw (database updated Sept. 2025) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct . . . ."); *see generally* J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act*, 11 Del. L. Rev. 71 (2010).

[25] *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010); *accord ZRii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009) (citing *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002)).

resembles the corresponding aspect of a common-law tort: The plaintiff must prove

that the defendant owed a fiduciary duty to the plaintiff. The second element departs

from the common-law model in significant respects. For a common-law tort, the court

analyzes breach using the standard of conduct that the defendant was expected to

follow.[26] For a breach of fiduciary duty, the court evaluates breach using a standard

of review.[27] The standard of review is always more forgiving towards the defendant

fiduciary and more onerous for the plaintiff beneficiary than the standard of

conduct.[28] Delaware decisions traditionally did not acknowledge the distinction

---

[26] *See generally* Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Fordham L. Rev. 437, 461–67 (1993).

[27] *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 35–36 (Del. Ch. 2013); *see also* William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of* Van Gorkom *and its Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 451–52 (2002) [hereinafter *Realigning the Standard*]; William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1295–99 (2001) [hereinafter *Function Over Form*].

[28] *Chen*, 87 A.3d at 667 ("The numerous policy justifications for this divergence largely parallel the well-understood rationales for the business judgment rule."). For cogent explanations, see *Function over Form*, *supra*, at 1296, and *Realigning the Standard*, *supra*, at 455, 451–58; *accord* Eisenberg, *supra*, at 461–67; E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992–2004? A Retrospective on Some Key Developments*, 153 U. Pa. L. Rev. 1399, 1421–28 (2005); Julian Velasco, *The Role of Aspiration in Corporate Fiduciary Duties*, 54 Wm. & Mary L. Rev. 519, 553–58 (2012). Opinions articulating the policy rationales for applying standards of review that are more lenient than the underlying standards of conduct include *Brehm*, 746 A.2d at 255–56 and *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996) (Allen, C.).

between the standard of conduct and the standard of review,[29] but Delaware jurists now do so openly to explain the divergence between the normative framing of what fiduciary duties require and their practical application to the facts of a case.[30]

Although a claim for breach of fiduciary duty has only two formal elements, a beneficiary cannot obtain a meaningful remedy without additional showings that parallel the other elements of a traditional common-law tort. One is harm to the beneficiary or a benefit wrongly received by the fiduciary.[31] Another is a sufficiently

---

[29] *See* David Kershaw, *The Foundations of Anglo-American Corporate Fiduciary Law* 185, 221–22 (2018). Despite the lack of open acknowledgement, the divergence could be seen in earlier cases, such as decisions distinguishing between the articulated duty of directors to exercise reasonable care and the liability standard of gross negligence. *See, e.g.*, *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (subsequent history omitted); *In re Walt Disney Deriv. Litig.* (*Disney I*), 907 A.2d 693, 749–50 (Del. Ch 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (*Disney II*). Professor Kershaw notes that New York cases maintained a similar distinction from the late nineteenth century until the codification of the fiduciary standard of care in 1961. *See* Kershaw, *supra*, at 185–86.

[30] *See, e.g.*, *Manti Hldgs., LLC v. Carlyle Gp. Inc.*, 2022 WL 1815759, at *7 (Del. Ch. June 3, 2022) (Glasscock, V.C.); *Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *15 (Del. Ch. May 31, 2022) (McCormick, C.); *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 809 (Del. Ch. 2022) (Will, V.C.); *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *30 (Del. Ch. May 6, 2021) (Zurn, V.C.); *Cumming v. Edens*, 2018 WL 992877, at *18 (Del. Ch. Feb. 20, 2018) (Slights, V.C.); *In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *27 n.202 (Del. Ch. July 24, 2014) (Noble, V.C.); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457–59 (Del. Ch. 2011) (Laster, V.C.); *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1112 (2008) (Parsons, V.C.); *see also Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1275 n.102 (Del. 2018) (Strine, C.J.).

[31] *See Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 838 (Del. 2011) ("[I]t is inequitable to permit the fiduciary to profit from using confidential corporate information. Even if the corporation did not suffer actual harm, equity requires disgorgement of that profit."); Doug Rendleman, *Measurement of Restitution:*

convincing causal linkage between the breach and the remedy sought.[32] A court may award nominal damages when a breach does not warrant a meaningful remedy.[33]

### 2. Fiduciary Status

The Complaint pleads that the Outside Directors are fiduciaries in their capacity as members of the Board. If the Master Fund was a corporation, then little

---

*Coordinating Restitution with Compensatory Damages and Punitive Damages*, 68 Wash. & Lee L. Rev. 973, 990 (2011) ("Actual harm to the corporation is not . . . a prerequisite for a plaintiff to state a claim for restitution-disgorgement.").

[32] *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773, 775 (Del. 2006) (explaining that when seeking post-closing damages for breach of fiduciary duty based on false or misleading disclosures, plaintiff must prove a causal link between disclosure violation and quantifiable damages); *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, *20–21 (Del. Ch. July 21, 2017) (finding transaction was entirely fair where controller engaged in acts of unfair dealing, but third party bidder intervened and severed any causal connection between controller's actions and ultimate deal price), *aff'd*, 184 A.3d 1291 (Del. Apr. 23, 2018); *see also In re Wayport, Inc. Litig.*, 76 A.3d 296, 314–15 (Del. Ch. 2013) ("A failure to disclose material information in [the context of a request for stockholder action] may warrant an injunction . . . but will not provide a basis for damages from defendant directors absent proof of (i) a culpable state of mind or non-exculpated gross negligence, (ii) reliance by the stockholders . . . , and (iii) damages proximately caused by that failure.").

[33] *See, e.g., Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at *2, *19, *25 (Del. Ch. Mar. 21, 2018) (awarding nominal damages for breach of duty); *Lake Treasure Hldgs., Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *1, *9, *13 (Del. Ch. Oct. 10, 2014) (same); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *51 & n.429 (Del. Ch. Sept. 4, 2014) (same); *Oliver v. Bos. Univ.*, 2006 WL 1064169, *25, *29, *30, *32, *34–35 (Del. Ch. Apr. 14, 2006) (same).

more need be said. Directors are fiduciaries who owe duties of loyalty and care to the corporation and its stockholders as a whole.[34]

Here, the analysis is more complicated. The Master Fund is a Delaware limited partnership, and the Investment Manager is its general partner. Under Delaware law, "[t]he general partner of a limited partnership owes fiduciary duties to the partnership for the ultimate benefit of the partners, unless the limited partnership agreement eliminates or limits them."[35] Likewise, under Delaware law, the individuals who control or comprise the governing body of the entity that serves as the general partner of a limited partnership owe fiduciary duties to the partnership for the ultimate benefit of the partners—here too unless the limited partnership agreement eliminates or limits them.[36] Perkins controls the Investment Manager, so

---

[34] *Aronson*, 473 A.2d at 811 ("The existence and exercise of [the board's authority under Section 141(a)] carries with it certain fundamental fiduciary obligations to the corporation and its shareholders."); *see MacLaughlan v. Einheiber*, — A.3d —, 2026 WL 615751, at *11 (Del. Ch. Feb. 26, 2026) ("For over two centuries, American courts have treated corporate directors as fiduciaries. Today, the proposition is axiomatic." (footnotes omitted)).

[35] *Leo Invs. Hong Kong Ltd. v. Tomales Bay Cap. Anduril III, L.P.*, 342 A.3d 1166, 1193 (Del. Ch. 2025); *accord Feeley v. NHAOCG, LLC,* 62 A.3d 649, 662 (Del. Ch. 2012); *see Metro Ambulance, Inc. v. E. Med. Billing, Inc.*, 1995 WL 409015, at *3 (Del. Ch. July 5, 1995) (identifying "general partners" among the relationships that "carry the 'special' nature of a fiduciary relationship"); *McMahon v. New Castle Assocs.*, 532 A.2d 601, 605 (Del. Ch. 1987) (Allen, C.) (same); *Boxer v. Husky Oil Co.*, 429 A.2d 995, 997 (Del. Ch. 1981) ("The duty of the general partner in a limited partnership to exercise the utmost good faith, fairness, and loyalty is, therefore, required both by statute and common law.").

[36] *USACafes,* 600 A.2d at 47–48; *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *10 (Del. Ch. Apr. 20, 2009). The extension of

27

he owes fiduciary duties under that route. But the LP Agreement did not follow the familiar path of having an entity with a board of directors act as the general partner.

The LP Agreement instead provides that the General Partner delegates its managerial duties to the Board. The operative language states:

> The General Partner delegates to the Directors those rights and powers of the General Partner necessary for the Directors to manage and control the business affairs of the [Master Fund] and to carry out their oversight obligations with respect to the Partnership required under the 1940 Act, state law, and other applicable laws or regulations. Rights and powers delegated to the Directors include, without limitation, the authority as Directors to oversee and to establish policies regarding the management, conduct and operation of the Partnership's business, and to do all things necessary and proper as Directors to carry out the objective and business of the Partnership, including, without limitation, the power to engage the Investment Manager to provide Advice and Management and to remove the Investment Manager, as well as to exercise any other rights and powers expressly given to the Directors under this Agreement.[37]

That provision imbues the Board with the "rights and powers" the General Partner would otherwise exercise.

The Delaware Limited Partnership Act (the "LP Act") authorizes a delegation of this type. It states:

> Unless otherwise provided in the partnership agreement, a general partner of a limited partnership has the power and authority to delegate to 1 or more other persons any or all of the general partner's rights, powers and duties to manage and control the business and affairs of the limited partnership, which delegation may be made irrespective of whether the general partner has a conflict of interest with respect to the

---

duties does not encompass the duty of care. *See Leo Invs.,* 342 A.3d at 1196; *accord Feeley*, 62 A.3d at 671.

[37] LPA § 3.1(a).

matter as to which its rights, powers or duties are being delegated, and the person or persons to whom any such rights, powers or duties are being delegated shall not be deemed conflicted solely by reason of the conflict of interest of the general partner. Any such delegation may be to agents, officers, and employees of the general partner or the limited partnership and by a management agreement or another agreement with, or otherwise to, other persons, including a committee of 1 or more persons. Unless otherwise provided in the partnership agreement, such delegation by a general partner of a limited partnership shall be irrevocable if it states that it is irrevocable. Unless otherwise provided in the partnership agreement, such delegation by a general partner of a limited partnership shall not cause the general partner to cease to be a general partner of the limited partnership or cause the person to whom any such rights, powers and duties have been delegated to be a general partner of the limited partnership. No other provision of this chapter or other law shall be construed to restrict a general partner's power and authority to delegate any or all of its rights, powers, and duties to manage and control the business and affairs of the limited partnership.[38]

---

[38] 6 *Del. C.* § 17-403(c). I continue to believe that the LP Act would benefit by having a section providing upfront that a partnership agreement can modify the provisions of the LP Act, then identifying any exceptions to the general rule. Delaware's General Partnership Act provides a model. *See* 6 *Del. C.* § 15-103. Adding that type of provision would avoid the need for the repetitive "[u]nless otherwise provided in the partnership agreement" that plagues the LP Act's prose. And given that the LP Act is addressing limited partnerships, it seems unnecessary to regularly include the prepositional phrase "of a limited partnership." Section 17-403(c) might then state:

A general partner can delegate any or all of its rights, powers, and duties to 1 or more other persons, including agents, officers, and employees of the general partner or the limited partnership. A general partner who faces a conflict of interest can delegate rights, powers, and duties, and the delegation alone does not make the recipient conflicted. A delegation can be irrevocable. A delegation does not cause the general partner to cease being a general partner or make the recipient a general partner. No other law can restrict a general partner's ability to delegate its rights, powers, and duties.

Notably, this section authorizes the delegation of "rights, powers[,] and duties," which inferably includes fiduciary duties.[39]

The initial delegation in the LP Agreement only encompasses "rights and powers," not duties. But equity imposes concomitant duties when a person exercises rights and powers over property belonging to another.[40] Here, duties follow delegation.

---

That brings down the word count from 283 to 99. The General Partnership Act offers an alternative formulation that falls in between this suggestion and the LP Act's version. *See* 6 *Del. C.* § 15-401(l).

[39] Elsewhere, the LP Act expressly includes references to fiduciary duties. *See* 6 *Del. C.* § 17-1101(d) & (f). The keepers of the LP Act added that language after a judicial debate over whether a member of an LLC with managerial authority owed fiduciary duties by default. *See Feeley*, 62 A.3d at 659–63 (discussing that debate). The drafters of the Delaware Limited Liability Company Act based its language on the LP Act, and the terms of the statutes are often kept consistent. *See Elf Atochem N. Am. Inc. v. Jaffari*, 727 A.2d 286, 290 (Del. 1999) (noting that the LLC act was "modeled on the popular Delaware LP Act" and that "its architecture and much of its wording is almost identical to that of the Delaware LP Act."). With the guardians of the alternative entity statutes having confirmed that "duties" include "fiduciary duties," that clarification flows through the statues as a whole.

[40] The canonical example is Section 141(a) of the Delaware General Corporation Law. 8 *Del. C.* § 141(a). The statue confers nigh plenary power on the board of directors of a Delaware corporation (subject to statutory, charter-based, and governance-agreement-based constraints) and, accordingly, brings with it fiduciary duties. *Aronson*, 473 A.2d at 811; *accord N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("The directors of Delaware corporations have the legal responsibility to manage the business of a corporation for the benefit of its shareholder owners. Accordingly, fiduciary duties are imposed upon the directors to regulate their conduct when they perform that function." (footnotes & quotation marks omitted)); *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 119 (Del. 2006) ("The legal responsibility to manage the business of the corporation for the benefit of the stockholder owners is conferred on the board of directors by statute. The common law imposes fiduciary duties upon the directors of Delaware

30

The LP Agreement makes the extension of duties express by stating that the Board owes fiduciary duties to the same degree as a directors of a Delaware corporation:

> The Partners intend that, to the fullest extent permitted by law, and except to the extent otherwise expressly provided in this Agreement, (1) each Director is vested with eh same powers and authority on behalf of the Partnership as are customarily vested in each director of a Delaware corporation and (2) each Independent Director is vested with the same power and authority on behalf of the Partnership as are customarily invested in each director who is not an "interested person" (as that term is defined in the 1940 Act), of a closed-end, management investment

corporations to constrain their conduct when discharging that statutory responsibility." (footnotes omitted)); *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998) ("The board of directors has the legal responsibility to manage the business of a corporation for the benefit of its shareholder owners. Accordingly, fiduciary duties are imposed on the directors of Delaware corporations to regulate their conduct when they discharge that function." (footnotes omitted)); *Cede & Co. v. Technicolor, Inc.* (*Technicolor Plenary II*), 634 A.2d 345, 360 (Del. 1993) ("Our starting point is the fundamental principle of Delaware law that the business and affairs of a corporation are managed by or under the direction of its board of directors. 8 Del. C. § 141(a). In exercising these powers, directors are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders."), *decision modified on reargument on other grounds*, 636 A.2d 956 (Del. 1994); *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) ("It is basic to our law that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation. 8 *Del. C.* § 141(a). In discharging this function, the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders."); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179 (Del. 1986) ("The ultimate responsibility for managing the business and affairs of a corporation falls on its board of directors. 8 *Del. C.* § 141(a). In discharging this function the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders." (footnote omitted)); *see also Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281, 1291 (Del. 1998) (citing the board's "statutory authority to manage the corporation under 8 *Del. C.* § 141(a) and its concomitant fiduciary duty pursuant to that statutory mandate.").

31

company registered under the 1940 Act that is organized as a Delaware corporation).[41]

Not content with that reference to fiduciary status, the LP Agreement further provides that "[e]ach Director will be the agent of the Partnership . . . ."[42] An agent is also a fiduciary.[43]

The LP Act directs the court to apply fiduciary duties as framed in the LP Agreement,[44] but the combination of contract rights, delegated general partner

---

[41] LPA § 3.1(a).

[42] *Id.*

[43] Restatement (Third) of Agency § 1.01 (Am. L. Inst. 2006) (defining agency as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act"); id. § 8.01 ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship"); see *Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980) ("It is true, of course, that under elemental principles of agency law, an agent owes his principal a duty of good faith, loyalty and fair dealing."); *In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 365 (Del. Ch. 2023) ("Agents are fiduciaries."); Ramon Casadesus-Masanell & Daniel F. Spulber, *Trust and Incentives in Agency*, 15 S. Cal. Interdisc. L.J. 45, 68 (2005) ("While all agents are fiduciaries, not all fiduciaries are agents."); Thomas Earl Geu, *A Selective Overview of Agency, Good Faith and Delaware Entity Law*, 10 Del. L. Rev. 17, 20 (2008) (explaining that fiduciary status is "a result of agency" and collecting authorities establishing the point); Barak Orbach, *D&O Liability for Antitrust Violations*, 59 Santa Clara L. Rev. 527, 528 n.2 (2020) ("All agents are fiduciaries but not all fiduciaries are agents"). There are Delaware cases which assert errantly that an agency relationship, standing alone, does not give rise to fiduciary duties on the part of the agent. For a discussion of those decisions, *see Metro Storage International LLC v. Harron*, 275 A.3d 810, 843 n.14 (Del. Ch. 2022).

[44] 6 *Del. C.* § 17-1101(d) ("To the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties) to a limited partnership or to

duties, express director duties, and agent duties creates a jurisprudential mashup. Which of those bodies of law should the court consult for content? From that confusion emerges the beauty of the contractarian entity,[45] where parties can create an infinite range of frameworks under which contractual and fiduciary duties interact.[46]

Whether a duty arises in equity or by contract is not pointless scholasticism. It affects whether another party can aid or abet a breach, because a party cannot aid or

---

another partner or to another person that is a party to or is otherwise bound by a partnership agreement, the partner's or other person's duties may be expanded or restricted or eliminated by provisions in the partnership agreement; provided that the partnership agreement may not eliminate the implied contractual covenant of good faith and fair dealing.").

[45] *See* 6 *Del. C.* § 17-1101(c) ("It is the policy of this chapter to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements.").

[46] *See Calumet Cap. P'rs LLC v. Victory Park Cap. Advisors, LLC*, — A.3d —, 2026 WL 246995, at *7–15 (Del. Ch. Jan. 29, 2026) (comparing a purely contractual relationship that adds contractual duties with a fiduciary relationship that restricts the scope of those duties). Not only that, but parties cannot invariably determine by contract whether fiduciary duties apply. Party intent is a factor, but not determinative: "An agency relationship arises only when the elements stated in § 1.01 are present. Whether a relationship is characterized as agency in an agreement between parties . . . is not controlling." Restatement (Third) of Agency, *supra*, § 1.02. A principal can authorize an agent to engage in specific types of conduct that otherwise might breach the agent's duties, but the parties cannot determine by contract whether or not the fiduciary relationship exists. *See id.* § 8.06(1)(b); Andrew F. Tuch, *Disclaiming Loyalty: M&A Advisors and Their Engagement Letters: In response to William W. Bratton & Michael L. Wachter, Bankers and Chancellors*, 93 Tex. L. Rev. 211, 217 (2015); *see also, e.g.*, *Ha-Lo Indus., Inc. v. Credit Suisse First Bos., Corp.*, 2005 WL 2592495, at *5–6 (N.D. Ill. Oct. 12, 2005) (denying a motion for summary judgment that argued that a clause in an engagement letter disclaiming a fiduciary duty between a financial advisor and its client prevented the bank from owing fiduciary duties to its client).

abet a breach of contract.[47] It also affects the elements of the claim. If the duty is fiduciary, then common law tort law—legal or equitable[48]—governs the elements of the claim, the burden of proof, the standard of conduct, the standard of review, and the available remedies. If the duty is contractual, then contract law determines "the elements of a claim, the burden of proof, the standard of conduct, and the available remedies."[49]

Here, the Outside Directors owe duties grounded in equity. Those duties spring from the principles of equity that govern a general partner, flow to the Outside

---

[47] *See Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 194 (Del. Ch. 2014) (exploring whether duties under a limited partnership agreement were contractual or fiduciary because of implications for aiding and abetting claims; noting that "[w]hen parties establish a purely contractual relationship, they have chosen to limit themselves to pursuing contractual remedies against their contractual counterparties. Under those circumstances, a claim for aiding and abetting cannot be used to expand the possible range of defendants."); *see also Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *11 (Del. Ch. Jan. 18, 2013) (holding that defendants could not aid and abet a breach of a limited partnership agreement where the agreement eliminated fiduciary duties).

[48] "A claim for breach of fiduciary duty is an equitable tort." *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 840 (Del. Ch. 2022); *accord Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *54 (Del. Ch. July 12, 2010) ("A breach of fiduciary duty is easy to conceive of as an equitable tort."); *see Restatement (Second) of Torts* § 874 cmt. b (A.L.I. 1979) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct ...."). *See generally* J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act*, 11 Del. L. Rev. 71 (2010).

[49] *See Calumet Cap. P'rs,* 2026 WL 374887, at *9.

Directors through the delegation, and are then tailored through the LP Agreement.[50]

The Outside Directors are therefore fiduciaries. At a minimum, the Outside Directors owe director duties, so this decision focuses there.

### 3. Breach

The element of breach is nuanced. To reiterate, when determining whether directors have breached their duties when pursuing a transaction, Delaware law distinguishes between the standard of conduct and the standard of review. "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[51]

The business judgment rule is Delaware's default standard of review. The rule presumes that "in making a business decision the directors of a corporation acted on

---

[50] Without the general partner's baseline duties and the delegation to the Directors, the source of the Board's duties would be less clear. The LP Act technically does not say that a limited partnership agreement can impose fiduciary duties on someone who does not already owe them. To the contrary, it limits a partnership agreement's ability to expand, restrict, or modify duties "[t]o the extent that, at law in equity, a person or other partner has duties (including fiduciary duties) . . . ." 6 *Del. C.* § 18-1101(c). But that would not seem to pose a problem for the predominantly contractarian framework that the LP Act establishes. And to the extent the LP Act does not address an issue, then "the rules of law and equity" govern. 6 *Del. C.* § 17-1105. The rules of law and equity envision that contractual relationships like delegations of authority can give rise to fiduciary duties. *See, e.g., J. Leo Johnson, Inc. v. Carmer*, 156 A.2d 499, 585–86 (Del. 1959) (rejecting defendant's argument that the parties' relationship was purely contractual, in part, because defendant "was acting as either trustee or agent."); *see also New Enter. Assocs. 14, L.P. v. Rich* (*NEA II*), 295 A.3d 520, 544–47 (Del. Ch. 2023) (discussing non-contractible aspects of fiduciary relationships).

[51] *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

35

an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[52] Unless a plaintiff rebuts one of those elements, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives."[53] Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty.[54] The business judgment rule thus provides "something as close to non-review as our law contemplates."[55] This standard of review "reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation."[56]

---

[52] *Aronson*, 473 A.2d at 812.

[53] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010).

[54] *See Brehm*, 746 A.2d at 264 ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." (footnote omitted)); *In re J.P. Stevens & Co., S'holders Litig.*, 542 A.2d 770, 780–81 (Del. Ch. 1988) (Allen, C.) ("A court may, however, review the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.").

[55] *Kallick v. Sandridge Energy, Inc.*, 68 A.3d 242, 257 (Del. Ch. 2013).

[56] *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009).

Enhanced scrutiny is Delaware's intermediate standard of review.[57] Enhanced scrutiny applies to specific, recurring, and readily identifiable situations marked by two features. First, there is a distinct decision-making context where the realities of the situation can subtly undermine the decisions of even independent and disinterested fiduciaries.[58] Second, the decision under review involves the directors intruding into a space where stockholders possess rights of their own.[59] The directors'

---

[57] *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 249 (Del. Ch. 2021).

[58] *Trados II*, 73 A.3d at 43.

[59] *See In re Columbia Pipeline Gp., Inc. Merger Litig.*, 299 A.3d 393, 458–59 (Del. Ch. 2023) (examining enhanced scrutiny precedents and demonstrating how they fit this pattern), *rev'd on other grounds*, 342 A.3d 324 (Del. 2025).

The second criterion—areas where stockholders have rights of their own—explains why enhanced scrutiny does not apply to CEO compensation decisions, even though the situational dynamics surrounding CEO compensation might otherwise raise sufficient concerns. *See* Jae Yoon, *Corporate Waste Crossing The Rubicon: The Case For Executive Compensation Award Enhanced Scrutiny Applied Review*, 7 Corp. & Bus. L.J. 149, 188–89 (2026) (arguing that CEO compensation presents a recurring scenario involving situational pressures that can undermine the decisions of even disinterested and independent directors); *see also* Lucian Bebchuk & Jesse Fried, *Pay Without Performance: The Unfulfilled Promise of Executive Compensation* 2, 37–39 (2006) (describing informational disparities that outside directors confront when making compensation decisions), *cited in Disney I*, 907 A.2d at 699 n.1; Lisa M. Fairfax, *Sue on Pay: Say on Pay's Impact on Directors' Fiduciary Duties*, 55 Ariz. L. Rev. 1, 17 (2013) (describing the dominant academic framework for understanding executive compensation, which recognizes that "directors are too often at an informational disadvantage when assessing and approving compensation packages," and "[a]s a result, they defer to executives or other corporation managers who may have more expertise and experience"); Michael B. Dorff, *Does One Hand Wash the Other? Testing the Managerial Power and Optimal Contracting Theories of Executive Compensation*, 30 J. Corp. L. 255, 261, 266–67 (2005) (describing the "Managerial Power Hypothesis" as including the claim that "directors who wish to question

37

exercise of corporate power therefore raises questions about the allocation of authority within the entity and, from a theoretical perspective, implicates the principal-agent problem.[60] The resulting scenarios call for an intermediate standard of review that examines "the reasonableness of the end that the directors chose to pursue, the path that they took to get there, and the fit between the means and the end."[61]

---

management, despite [other] contrary incentives, have limited resources with which to do so" and finding that the results of the article's analysis "strongly support the Managerial Power Hypothesis, that the existence of managerial power over directors erodes directors' ability to restrain managers from pursuing their own interests at the corporation's expense"); Lucian Arye Bebchuk, Jesse M. Fried & David I. Walker, *Managerial Power and Rent Extraction in the Design of Executive Compensation*, 69 U. Chi. L. Rev. 751, 766 (2002) (discussing problems that independent directors face when overseeing insiders' compensation and performance, including that "even if directors were otherwise inclined to challenge managers on the issue of executive compensation, they would likely have neither the financial incentive nor sufficient information to do so"); *id.* at 772 ("[E]ven if directors have the inclination and incentive to negotiate for CEO compensation that maximizes shareholder value, they will usually lack the information to do so effectively. The CEO, by way of his personnel department, controls much of the information that reaches the committee.").

[60] To be clear, directors and officers are not agents of the stockholders, nor are the stockholders their principals. "A board of directors, in fulfilling its fiduciary duty, controls the corporation, not *vice versa*. It would be an analytical anomaly, therefore, to treat corporate directors as *agents* of the corporation when they are acting as *fiduciaries* of the stockholders in managing the business and affairs of the corporation." *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 678 A.2d 533, 540 (Del. 1996) (footnote omitted); *see also Presidio*, 251 A.3d at 286 ("Rather than treating directors as agents of the stockholders, Delaware law has long treated directors as analogous to trustees for the stockholders."). The principal-agent problem uses the language of economic theory, not the language of legal relationships.

[61] *Obeid v. Hogan*, 2016 WL 3356851, at *13 (Del. Ch. June 10, 2016).

Delaware's most onerous standard of review is the entire fairness test. When entire fairness governs, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price."[62] "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness."[63] "Rather, the transaction itself must be objectively fair, independent of the board's beliefs."[64]

If a claim does not identify any of the recurring scenarios that could implicate enhanced scrutiny, then the business judgment rule presumptively applies. At the pleading stage, to change the standard of review from the business judgment rule to entire fairness, the complaint must allege facts supporting a reasonable inference that the directors who approved the challenged action did not include independent and disinterested directors, acting carefully and in good faith, with enough voting power by themselves to deliver the requisite majority for taking action.[65]

---

[62] *Cinerama, Inc. v. Technicolor, Inc.*, (*Technicolor Plenary*), 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted).

[63] *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

[64] *Id.*

[65] *See Aronson*, 473 A.2d at 812 (noting that if "the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application"). The voting power formulation is necessary because the Delaware General Corporation Law authorizes a charter to grant some directors greater voting rights. 8 *Del. C.* § 141(d); *see Marchand v. Barnhill*, 212 A.3d 805, 815 (Del. 2019) (evaluating demand futility where one director exercised multiple votes). Independent and disinterested directors who acted with due care and in good faith may therefore deliver the requisite majority of the director voting power, even if they

39

Count I of the Complaint differentiates between Perkins and the Outside Directors. The Complaint alleges that Perkins was interested in the decisions the Board made because of his control over and majority ownership of the Investment Manager. Perkins does not argue that Count I fails to state a claim against him.

The Complaint contends that the Outside Directors breached their duty of care. Under current law, a plaintiff can rebut the business judgment rule and disqualify a director for purposes of the business judgment rule by pleading that the director breached the duty of care.[66]

For purposes of the standard of conduct, the duty of care requires that directors exercise reasonable care.[67] For purposes of the standard of review, the level of care varies:

---

do not constitute a majority of the humans on the board. The requisite majority could also be a supermajority if that is what the entity's governing documents require.

[66] *Technicolor Plenary II*, 634 A.2d at 367–68. Chief Justice Strine has argued against this approach. *See Function over Form, supra*, at 1301–05 (examining policy implications of decision), *Realigning the Standard, supra*, at 460–62 (same), and Leo E. Strine, Jr. et. al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 673–84 (2010) (analyzing decision's reasoning). Under the alternative framework he proposes, a claim for breach of the duty of care would resemble a common law tort claim for negligence, in which the plaintiff would have to prove breach, causation, and damages. The analysis would not flow through the entire fairness test, in which the defendants gain the ability to prove entire fairness but functionally have to disprove causation.

[67] *Aronson*, 473 A.2d at 812.

- When the business judgment rule applies, the level of carelessness is gross negligence.[68]

- When enhanced scrutiny applies, the level of carelessness is action that falls outside a range of reasonableness.[69]

- When entire fairness applies, the level of carelessness is action resulting in a decisionmaking process that fails to satisfy the fair dealing dimension of the unitary entire fairness test.[70]

Finally, the Delaware Supreme Court has established a separate standard of liability: "When disinterested directors themselves face liability, the law, for policy reasons, requires that they be deemed to have acted with gross negligence in order to sustain a monetary judgment against them."[71] Thus, even if a court finds that the directors

---

[68] *Id.*

[69] *E.g.*, *Paramount Commc'ns Inc. v. QVC Network, Inc.*, 637 A.2d 34, 36 (Del. 1994) (rejecting sale process that "was not reasonable as to process or result"); *id.* at 45 (identifying as a key feature of enhanced scrutiny "the adequacy of the decisonmaking process employed by the directors, including the information on which the directors based their decision"); *id.* (noting that the directors bore "the burden of proving that they were reasonably informed"); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 949, 955, 958 (Del. 1985) (requiring a "reasonable investigation").

[70] *E.g.*, *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1244 (Del. 2012) (affirming trial court's finding that "the process by which the Merger was negotiated and approved was not fair" and produced an unfair price); *Disney II*, 906 A.2d 27, 52 (Del. 2006) (explaining that the business judgment rule can be rebutted by establishing that "the directors breached their fiduciary duty of care" and that "[i]f that is shown, the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders"); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983) (explaining that the fair dealing dimension of the entire fairness test includes "how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors . . . were obtained").

[71] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 857 (Del. 2015).

breached their duty of care under the operative standard of review, a plaintiff still must prove gross negligence to recover money damages.[72]

Here, the business judgment rule presumptively applies, so the standard of review requires gross negligence. In civil cases not involving business entities, the Delaware Supreme Court has defined gross negligence as "a higher level of negligence representing 'an extreme departure from the ordinary standard of care.'"[73] Under

---

[72] *Singh v. Attenborough*, 137 A.3d 151, 151 (Del. 2016) (ORDER) ("Absent a stockholder vote and absent an exculpatory charter provision, the damages liability standard for an independent director or other disinterested fiduciary for breach of the duty of care is gross negligence, even if the transaction was a change-of-control transaction."); *accord McMillan v. Intercargo Corp.*, 768 A.2d 492, 505 n.56 (Del. Ch. 2000) (asserting that whenever a plaintiff pursues a post-closing damages claim for breach of fiduciary duty, "[i]n the absence of the exculpatory charter provision, the plaintiffs would still have been required to plead facts supporting an inference of gross negligence in order to state a damages claim").

[73] *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1990) (quoting W. Prosser, *Handbook of the Law of Torts* 150 (2d ed. 1955)). This test "is the functional equivalent" of the test for "[c]riminal negligence." *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 530 (Del. 1987). By statute, Delaware law defines "criminal negligence" as follows:

> A person acts with criminal negligence with respect to an element of an offense when the person fails to perceive a risk that the element exists or will result from the conduct. The risk must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

11 *Del. C.* § 231(a). The same statute provides that a person acts recklessly when "the person is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from the conduct." *Id.* § 231(e). As with criminal negligence, the risk "must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." *Id.*; *see id.* § 231(a).

that framework, gross negligence "signifies more than ordinary inadvertence or inattention," but it is "nevertheless a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm."[74] In Delaware entity law, by contrast, Delaware cases have held consistently that gross negligence encompasses recklessness.[75] The decision "has to be so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion."[76]

### a. Approving The Asset Sale

In its lead theory, Count I argues that the Outside Directors breached their duty of care when approving the Asset Sale. The Complaint pleads facts sufficient to

---

[74] *Jardel*, 523 A.2d at 530.

[75] *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 n.45 (Del. Ch. 2008) ("[T]he definition [of gross negligence in corporate law] is so strict that it imports the concept of recklessness into the gross negligence standard . . . ."); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) ("Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one which involves a devil-may-care attitude or indifference to duty amounting to recklessness." (cleaned up)); *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990) ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." (internal quotation marks omitted)); *see* *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008) ("[F]rom the sphere of actions that was once classified as grossly negligent conduct that gives rise to a violation of the duty of care, the Court has carved out one specific type of conduct— the intentional dereliction of duty or the conscious disregard for one's responsibilities—and redefined it as bad faith conduct, which results in a breach of the duty of loyalty. Therefore, Delaware's current understanding of gross negligence is conduct that constitutes reckless indifference or actions that are without the bounds of reason.").

[76] *Solash v. Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988) (Allen, C.) (cleaned up).

support an inference of gross negligence, thereby overcoming the business judgment rule and triggering entire fairness. The Complaint easily supports an inference that the Asset Sale was not entirely fair.

When evaluating gross negligence, a court must consider the decision-making context.[77] As the YWCA points out, directors considering a fundamental transaction must be particularly vigilant.[78] "[A] board of directors . . . may not avoid its active and direct duty of oversight in a matter as significant as the sale of [an entity.]"[79] One of the Delaware Supreme Court's clearest teachings is that "directors cannot be passive instrumentalities during merger proceedings."[80] In that setting, directors can breach their duty of care by failing to obtain information that they should have obtained, even when the information was withheld by others.[81] That is because "the buck stops with the Board."[82]

---

[77] *Albert*, 2005 WL 2130607, at *6 (explaining that evaluating gross negligence is a "fact-sensitive inquiry").

[78] *See* Answering Brief at 25.

[79] *Macmillan*, 559 A.2d at 1281; *accord Citron v. Fairchild Camera and Instrument Corp.*, 569 A.2d 53, 66 (Del. 1989).

[80] *Technicolor Plenary II*, 634 A.2d at 368 (citing *Unocal*, 493 A.2d at 954).

[81] *See In re Rural Metro Corp.* (*Rural Liability*), 88 A.3d 54, 93–96 (Del. Ch. 2014).

[82] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 835 (Del. Ch. 2011).

44

As the YWCA argues, the Asset Sale may not have been a merger, but it was a fundamental transaction.[83] It involved a sale of all the Master Fund's assets in contemplation of liquidation. Before the General Assembly liberalized Delaware's merger statutes,[84] the preferred transaction structure involved the target corporation

---

[83] *See* Answering Brief at 26 ("The result for these previously widely diversified Funds was akin to a merger with or acquisition by [the Buyer], as the Funds' future prospects following the transaction would depend entirely on the performance of [the Buyer] and its management.").

[84] "In the Nineteenth Century, a merger almost always meant the melding of two different businesses into one, akin to the formation of a partnership among individual proprietorships. All of the stockholders in all of the constituent corporations had to approve the combination, and each automatically became a stockholder of the surviving corporation." 2 David A. Drexler, et. al., *Delaware Corporation Law and Practice* § 35.03, at 35-4 (2024). The concept of a "merger" thus meant a direct, stock-for-stock merger between two entities, and it required unanimous stockholder approval to effectuate.

During the first half of the twentieth century, the merger remained a "cumbersome, seldom-used mechanism," even after the General Assembly lowered the voting requirement to two-thirds of the outstanding shares and then to a bare majority. *Id.* The DGCL continued to "require[ ] that the outstanding shares of each constituent corporation be converted into equity shares of the surviving corporation," making cash deals impossible. *Id.*

In 1941, the General Assembly amended the long-form merger statute so that the shares of a constituent corporation could be converted into "shares or other securities." 43 Del. Laws ch. 132, § 12 (1941). Hypothetically, this amendment permitted a merger to provide target stockholders with the functional equivalent of cash consideration by converting their shares into short-term notes. See 2 Drexler, *supra*, § 35.03, at 35-4. In 1957, the General Assembly authorized the conversion of shares into cash in short-form mergers. 51 Del. Laws ch. 121, § 6 (1957); *see* 8 *Del. C.* § 253. Stockholder plaintiffs challenged the statute as unconstitutional, claiming that it destroyed a vested right to stock consideration, but the Delaware Supreme Court rejected this argument based on "the reserved power of the State to amend

selling all of its assets to the acquirer, then dissolving and distributing the consideration to its stockholders.[85] Before the 1980s, the great Delaware takeover cases largely involved sales of assets.[86] Those decisions "provided the vehicle for

---

corporation charters . . . ." *Coyne v. Park & Tilford Distillers Corp.*, 154 A.2d 893, 897 (Del. 1959).

In 1967, as part of a substantial rewrite of the DGCL, the General Assembly amended the long-form merger statute to authorize the conversion of a constituent corporation's shares into cash, debt securities, securities of other corporations, or other property. 56 Del. Laws ch. 50 (1967); *see* 1 R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations & Business Organizations § 9.11 (3d ed. 1998 & 2011 Supp.); *see also* 8 *Del. C.* § 251. After these amendments, it became possible to "structure mergers to accomplish a broad spectrum of transactions, including the cashout of minority interests and the acquisition of other corporations for cash . . . ." 2 Drexler, *supra*, § 35.03, at 35-6. The amendments also authorized triangular mergers, allowing acquirers to use a subsidiary as a constituent corporation and convert the shares of the target corporation into shares of the parent. *See* 1 Balotti & Finkelstein, *supra*, § 9.7. With these changes, the merger began its steady march to predominance.

[85] *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1033–34 (Del. Ch. 2020); *see generally* 2 Drexler, *supra*, § 37.04 at 37-8 to -9; Henry Winthrop Ballantine, *Ballantine on Corporations* §§ 279–80 (1946); George S. Hills, *Consolidation of Corporations by Sale of Assets and Distribution of Shares*, 19 Cal. L. Rev. 349 (1931).

[86] *Stream TV Networks*, 250 A.3d at 1034; *see, e.g., Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 609–18 (Del. Ch. 1974) (granting preliminary injunction against third-party sale of assets based on apparent breaches of the duty of care, citing the haste with which the board acted and disparate testimony regarding value), *aff'd*, 316 A.2d 619 (Del. 1974); *Alcott v. Hyman*, 184 A.2d 90, 96–97 (Del. Ch. 1962) (rejecting claim that sale of assets was a de facto merger and holding that price was fair even if controlling stockholder stood on both sides of transaction), *aff'd*, 208 A.2d 501 (Del. 1965); *Baron v. Pressed Metals of Am.*, 117 A.2d 357, 364 (Del. Ch. 1955) (holding that directors and majority stockholders did not breach their fiduciary duties when effectuating sale of corporation's assets), *aff'd*, 123 A.2d 848 (Del. 1956); *Robinson v. Pittsburgh Oil Refin. Co.*, 126 A. 46, 50–51 (Del. Ch. 1924) (Wolcott, C.) (denying motion for preliminary injunction to enjoin sale of assets; holding that directors

much of the development and refinement in Delaware of the law with respect to the business judgment presumption and the fiduciary duty owed by directors and majority stockholders to a minority." [87] For the fiduciaries considering the transaction, a sale of assets in contemplation of dissolution presents the same issues as a sale or merger.[88]

---

legitimately chose nominally lower-valued bid with more certain consideration over nominally higher-valued bid); *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486, 491, 496–97 (Del. Ch. 1923) (Wolcott, C.) (holding that controlling stockholder owed fiduciary duty to minority and granting preliminary injunction against sale of assets by controlling stockholder that appeared motivated by desire for short-term profit). *See generally* 2 Drexler, *supra*, § 37.04 at 37-8 ("A review of annotations suggests that perhaps more judicial scrutiny was given prior to 1967 to Section 271 than any other Section of law."); Ernest L. Folk, III, *The Delaware General Corporation Law: A Commentary and Analysis* 399–424 (1972) (collecting cases and describing range of issues raised by sales of assets under Section 271). Demonstrating the reversal of transactional fortunes, in 1931, this court issued a decision that described the settled principles governing a claim for breach of fiduciary duty in connection with a sale of assets and then applied them by analogy to a merger, explaining that "from the viewpoint of the constituent companies, a sale of assets is in substance involved." *Cole v. Nat'l Cash Credit Ass'n*, 156 A. 183, 188 (Del. Ch. 1931) (Wolcott, C.). The court further explained that the transaction could be regarded as "one where the stockholders of the defendant are in substance selling its assets to another in exchange for securities issued by the latter . . . ." *Id.*

[87] 2 Drexler, *supra*, § 37.04 at 37-8 to -9.

[88] Recognizing the transactional similarity between the Asset Sale and a merger does not contravene the "bedrock doctrine of independent legal significance." *Warner Commc'ns Inc. v. Chris–Craft Indus., Inc.*, 583 A.2d 962, 970 (Del. Ch. 1989) (Allen, C.), *aff'd*, 567 A.2d 419 (Del. 1989) (TABLE). Under that doctrine, "action taken in accordance with different sections of that law are acts of independent legal significance even though the end result may be the same under different sections." *Orzeck v. Englehart*, 195 A.2d 375, 377 (Del. 1963). "The mere fact that the result of actions taken under one section may be the same as the result of action taken under another section does not require that the legality of the result must be tested by the requirements of the second section." *Id.* at 365–66; *accord Fed. United Corp. v.*

The Asset Sale was also a significant transaction because after it closed, the Master Fund's fate would depend on the value of the Preferred Units—and hence on the Buyer's managerial acumen. No longer would the Investment Manager be the key figure in the Master Fund's success, nor would the Master Fund's fortunes depend on the skill the Investment Manager used in deploying its AUM across at least fifty alternative investment managers in compliance with the Diversification Policy. After the Asset Sale, the Master Fund would own only a single security, and the value of that security would rise or fall based on the skill of the Buyer's CEO. Although the Investment Manager would continue to have an obligation under the Advisor Agreement to craft and implement an investment program that met the

---

*Havender*, 11 A.2d 331, 338 (1940). *See generally* C. Stephen Bigler & Blake Rohrbacher, *Form or Substance? The Past, Present, and Future of the Doctrine of Independent Legal Significance*, 63 Bus. Law. 1 (2007).

The doctrine of independent legal significance applies to legal review, not equitable review. "[E]quity regards substance rather than form." *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983); *accord Phillips Petroleum Co. v. Arco Alaska, Inc.*, 1986 WL 7612, at *13 (Del. Ch. Jul. 9, 1986); *see In re Carlisle Etcetera LLC*, 114 A.3d 592, 607 (Del. Ch. 2015) ("Equity always attempts to ascertain, uphold, and enforce rights and duties which spring from the real relations of parties." (cleaned up)). Perhaps most famously, the Delaware Supreme Court explained in 1971 that "inequitable action does not become permissible simply because it is legally possible." *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971). In the takeover wars of the 1980s, it became established doctrine that a challenged defensive measure first must pass statutory muster, then survive equitable scrutiny. *See Marino v. Patriot Rail Co.*, 131 A.3d 325, 336 (Del. Ch. 2016) (collecting authorities). Put differently, independent legal significance is a Berle I doctrine, not a Berle II doctrine. *See Foley v. Session Corp.*, 345 A.3d 537, 552–53 (Del. Ch. 2025) (discussing distinction and its relationship to the distinction between legal and equitable review).

Diversification Policy, the Investment Manager would not be able to fulfill its contractual obligation until the Preferred Units became salable and the Master Fund sold. The Asset Sale would fundamentally change not only the assets the Master Fund held, but also how it operated and what would produce its success.

Delaware cases have drawn inferences of gross negligence when directors approved fundamental transactions without adequate deliberation, without receiving meaningful due diligence, and in reliance on information provided by an interested party.[89] In *McPadden*, a sell-side board of directors relied on a fairness opinion and financial documents prepared by the transaction counterparty, despite the party's self-interest and the red flags surrounding the transaction.[90] The board failed to conduct its own investigation and ignored information that would have revealed miscalculations that were "extremely favorable to the buyer."[91] Chancellor Chandler ruled that "material and reasonably available information was not considered by the board" and "such lack of consideration constituted gross negligence."[92]

In this case, the Directors approved the Asset Sale at a single meeting on December 7, 2021. The Board did not receive a fairness opinion or other outside

---

[89] *See, e.g.*, *McPadden*, 964 A.2d at 1271–73; *In re Fedders N. Am., Inc.*, 405 B.R. 527, 542 (D. Del. Bankr. 2009); *see also Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 194 (Del. Ch. 2006).

[90] 964 A.2d at 1271.

[91] *Id.* at 1268.

[92] *Id.* at 1271.

advice. The Board relied solely on the Investment Manager, which was interested in the transactions because of the Buyer's promise to support its future funds.

At the time, public information about the Buyer and GWG included the following:

- The Buyer had yet to turn a profit and had no near-term expectations of doing so.

- The Buyer's financial statements showed that goodwill accounted for $2.36 billion out of $2.82 billion in total assets.

- The Buyer's public filings explained that its goodwill resulted from a series of interested transactions with GWG, its former parent.

- In July 2019, the Buyer's CFO resigned over concerns that its CEO had used the interested transactions to misappropriate funds.

- In October 2019, four outside directors resigned from both the Buyer and GWG boards after objecting to the interested transactions.

- During 2019, two successive audit firms for the Buyer terminated their engagements.

- In October 2020, the SEC began investigating GWG, the basis for consolidating its financial statements with the Buyer's, and the basis for the goodwill valuation.

- GWG announced that there was substantial doubt about its ability to continue as a going concern in light of the SEC investigation.

- GWG announced that its prior financial reports should not be relied upon and that it would restate its financials for 2019 and three quarters of 2020.

Yet the Board approved a transaction that would violate the Diversification Policy by investing all of the Master Fund's assets in the Preferred Units, and where the value of the Preferred Units depended initially on the accuracy of the Buyer's financial statements and over the long term on its CEO's business acumen.

Those facts support an inference of recklessness. The Outside Directors proverbially bet all of the Master Fund's AUM on black, despite a fundamental policy that prevented that.

The Outside Directors point out that the details in *McPadden* differ from this case, but the legal principle remains. The Outside Directors also argue that they are fully protected at the pleading stage because they relied on the Investment Manager. The concept of relying on experts reflects a "fundamental principle[] of corporate law" that "entitle[s] (impartial) fiduciaries to rely upon the advice of impartial experts as a defense."[93] But this defense does not displace the pleading-stage mandate that the court take all well-pled allegations as true, even though the reliance defense may

---

[93] Leo E. Strine, Jr., *Documenting the Deal: How Quality Control and Candor Can Improve Boardroom Decision-Making and Reduce the Litigation Target Zone*, 70 Bus. Law. 679, 680 (2015); *see OptimisCorp v. White*, 2015 WL 5147038, at \*70 (Del. Ch. Aug. 26, 2015) ("Directors are protected under Section 141(e) when the directors reasonably believe the information upon which they rely has been presented by an expert selected with reasonable care and is within that person's professional or expert competence." (internal quotations omitted)); *id.* (explaining that rebutting this presumption requires "show[ing] that [the directors] were grossly negligent in so relying").

ultimately prevail at trial.[94] Here, the Complaint adequately alleges the Investment

Manager was interested, not impartial.[95]

The Outside Directors even argue that they are also protected because they

relied on Portfolio Advisors, the Investment Manager's subadvisor. That assertion

mischaracterizes the Complaint and makes little sense in light of Portfolio Advisors'

role. As a sub-adviser, Portfolio Advisors assisted with selection and oversight of the

alternative investment funds in which the Master Fund invested. There is no reason

to draw the defense-friendly inference that Portfolio Advisors advised on the Asset

Sale.

---

[94] Whether the Outside Directors can prevail at trial depends on many factors, including the standard of review and the reasonableness of their reliance. Given the striking facts surrounding the Asset Sale, the court cannot address those issues at the pleading stage. *See Rural Metro*, 88 A.3d at 86 n.13 (noting that if an advisor's guidance led the directors to breach their duties, then they could be found to have committed a breach and yet be fully protected against liability for relying on the advisor); *accord Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *3 n.7 (Del. Ch. Dec. 19, 2002); *see also Valeant Pharm. Int'l v. Jerney*, 2007 WL 2813789, at *14 (Del. Ch. Mar. 1, 2007) (holding that availability of Section 141(e) defense to liability is not outcome-determinative on question of breach of duty under entire fairness test); *Boyer v. Wilm. Mat'ls, Inc.*, 754 A.2d 881, 910 (Del. Ch. 1999) (distinguishing between reliance on advisors as a factor in evaluating procedural fairness and a Section 141(e) defense); *Technicolor Plenary*, 663 A.2d at 1142 (same), *aff'd*, 663 A.2d 1156 (Del.1995).

[95] Though not all advisor conflicts are fatal, there are some conflicts a fiduciary cannot consent to in discharging their fiduciary duties. *In re Zale Corp. S'holders Litig.*, 2015 WL 5853693, at *20 (citing William W. Bratton & Michael L. Wachter, *Bankers and Chancellors,* 93 Tex. L. Rev. 1, 44, 56–61 (2014)); *accord In re Match Gp., Inc. Deriv. Litig.*, 2022 WL 3970159, at *25 (Del. Ch. Sept. 1, 2022), *rev'd on other grounds*, 315 A.3d 446 (Del. 2024). Chief among these is an actual "interest in the transaction that is material . . . [and] quantifiable." *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *8 (Del. Ch. June 27, 2008).

The Outside Directors also argue that they made a rational business judgment to turn to the Buyer for a short-term liquidity solution. From that perspective, the Asset Sale looks irrational. It did not provide any short-term liquidity to the Master Fund, instead locking the fund into an even more illiquid investment. The Outside Directors also could not have been sure that the investment was short term, because only a merger or sale of the Buyer would trigger a conversion of the Preferred Units into liquid shares, and the Outside Directors and the Investment Manager had no control over when that would happen. In the meantime, the Master Fund violated the Diversification Policy and rendered itself dependent on a Buyer and its CEO who were festooned with red flags.

The Outside Directors claim that the YWCA's allegations are conclusory or the product of hindsight, but that is not so. The Complaint points to specific facts about the Asset Sale, the Master Fund's pre-Asset Sale portfolio, the Preferred Units, the Buyer, and its CEO that were known or knowable at the time.

Although the Complaint does not go so far, the allegations about the Asset Sale could support a breach of the duty of loyalty. An inference of bad faith follows when a complaint alleges that a "fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[96] Delaware law

---

[96]*Disney II,* 906 A.2d at 67.

"clearly permits a judicial assessment of director good faith" for the purpose of rebutting the business judgment rule.[97]

Under the 1940 Act, a registered investment company cannot, without the approval of a majority of its outstanding voting securities, "deviate from its policy in respect of concentration of investments in any particular industry or group of industries as recited in its registration statement."[98] The LP Agreement provides that "[t]he assets of the Partnership shall be invested in accordance with the 'Asset Allocation Ranges'" found in Exhibit A.[99] The LP Agreement further provides that

> [t]he Directors may, in their sole and absolute discretion, change or modify such Asset Allocation Ranges from time to time, provided that . . . the Directors shall have no authority to . . . provide for a greater than 25% allocation, at the time of investment, to investments in which the Partnership does not have the right to redeem the investment on at least a quarterly basis after a lock-up period not to exceed one year after the date of investment.[100]

---

[97] *Id.* at 53; *accord eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 40 (Del. Ch. 2010).

[98] 15 U.S.C. § 80a-13(3) ("No registered investment company shall, unless authorized by the vote of a majority of its outstanding voting securities . . . deviate from its policy in respect of concentration of investments in any particular industry or group of industries as recited in its registration statement, deviate from any investment policy which is changeable only if authorized by shareholder vote, or deviate from any policy recited in its registration statement . . . .").

[99] LPA § 3.5(b).

[100] *Id.*

54

The Directors could only permit the Master Fund to invest more than 25% of its AUM in a single, non-redeemable security with "the approval of Limited Partners that collectively beneficially own sixty percent (60%) of the interests."[101]

The Asset Sale concentrated 100% of the Master Fund's AUM in a single security. The Diversification Policy was a fundamental policy, and the Outside Directors had a known obligation to comply with it under the 1940 Act and the LP Agreement. The Directors necessarily knew that the Asset Sale's closing would violate the Diversification Policy. The Directors inferably engaged in a conscious violation of a known duty. They inferably acted in bad faith by consciously ignoring that obligation.

This aspect of Count I states a claim for relief.

### b. Failing To Implement The Dissolution Plan

Count I next contends that the Outside Directors breached their duty of care by failing to ensure that the Investment Manager actually executed the Dissolution Plan. This aspect of Count I also pleads a claim.

In *Albert*, Vice Chancellor Lamb allowed a claim for the duty of care to survive a Rule 12(b)(6) motion to dismiss where the complaint alleged that fund managers devoted insufficient time and attention to managing the funds and made inaccurate

---

[101] *Id.*

disclosures about their activities.[102] Their inaction occurred during a period when the funds "were facing difficult challenges."[103]

The Complaint presents a similar picture. The Outside Directors approved the Asset Sale as part of the Dissolution Plan, yet after the Asset Sale closed, the Outside Directors inferably did nothing. For eighteen months, the Master Fund simply held the Preferred Units. Then for seven months after the Avalon Transaction, the Outside Directors inferably continued to do nothing. During those months, the single security that the Master Fund held lost 98% of its value. The Master Fund still has not done anything to carry out the Dissolution Plan.

During this time, the Outside Directors allowed the Investment Manager to send communications to investors that were inferably misleading. No one told the investors about the Asset Sale until December 30, 2021, more than three weeks after it closed.[104] The letter told investors that after exploring "multiple options to provide liquidity for investors who want out,"[105] it had entered into "a plan of liquidation" under which a "large institutional investor" would "buy 100% of [the Feeder Funds] assets."[106] Read in context, the letter implied that a blue-chip institutional investor

---

[102] *Albert*, 2005 WL 2130607, at *5.

[103] *Id.*

[104] Compl. ¶ 77.

[105] *Id.* ¶ 78.

[106] *Id.* ¶ 80.

was buying the assets for cash. The letter did not accurately describe the Buyer, did not explain that the Master Fund was accepting the Preferred Units, and did not disclose the Buyer's promise to provide financial support for the Investment Manager's future funds.

The Investment Manager next communicated with the Feeder Fund investors one year later, on December 9, 2022. That letter identified the Preferred Units for the first time and described the Preferred Units as an "intermediate step" toward liquidity. [107] The letter referenced the Avalon Transaction and described it as a "liquidity event," but did not explain that the Master Fund would receive shares of the Buyer's common stock instead of cash.[108]

These allegations support an inference of gross negligence in the sense of recklessness. The Outside Directors again argue that the facts of *Albert* differ from this case, but the legal principle is what counts.

Not only that, but as with the claim regarding the Asset Sale, the allegations about the Dissolution Plan could rise to the level of bad faith. Once the Outside Directors approved the Dissolution Plan, they had an obligation to either take meaningful steps to pursue it or abandon it and let the investors know.[109] Yet after

---

[107] *Id.* ¶ 107.

[108] *Id.* ¶ 108.

[109] *See MacLaughlan*, 2026 WL 615751, at *22 (explaining that a board of directors who failed to take steps to pursue a plan of dissolution "conceivably could breach its duty of loyalty by failing to act in good faith").

approving the Asset Sale as part of the Dissolution Plan, the Outside Directors have inferably done nothing. Today, the Master Fund continues to hold a single security, albeit one that has lost 98% of its value.

The Outside Directors contend that they properly delegated responsibility for the Dissolution Plan to the Investment Manager. A board can of course delegate responsibilities, but at some point, delegation becomes abdication, and a board breaches its fiduciary duties by abdicating its duties to oversee the business and affairs of an entity.[110] The Outside Directors inferably crossed that line.

Count I states a claim based on the Outside Directors' failure to take steps to pursue the Dissolution Plan.

### c.  Excess Annual Fees

Count I finally alleges that the Outside Directors breached their fiduciary duties by allowing the Investment Manager to continue to earn the same percentage Annual Fee even though the Investment Manager "was providing fewer services with

---

[110] *See W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 311 A.3d 809, 841–44 (Del. Ch. 2024) (collecting authorities); *Canal Cap. Corp. By Klein v. French,* 1992 WL 159008, at *2–3 (Del. Ch. July 2, 1992) (same); *see also SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008) ("Section 206 [of the Investment Company Act] imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund . . ."); *McRitchie v. Zuckerberg*, 315 A.3d 518, 574 (Del. Ch. 2024) ("[C]orporate directors have an obligation to seek to maximize the long-term value of the corporation for the benefit of its stockholders."); *Trados II,* 73 A.3d at 20 ("Directors of a Delaware corporation owe fiduciary duties to the corporation and its stockholders which require that they strive prudently and in good faith to maximize the value of the corporation for the benefit of its residual claimants.").

respect to each dollar under management."[111] This aspect of Count I states a claim on which relief can be granted, but barely and only because of the context surrounding the Outside Directors' inferably conscious inaction.

Under the Advisor Agreement, the Investment Manager received the Annual Fee equal to 1.00% of the Master Fund's net AUM. The YWCA argues that this fee compensated the Investment Manager for overseeing a fund of funds comprising at least fifty alternative investment providers, including the need to manage periodic tender offers to provide investors with liquidity. The YWCA argues that it made no sense to pay the Investment Manager at the same percentage of AUM once the Master Fund's assets were reduced to a single security and the Feeder Funds no longer made tender offers. At that point, the Investment Manager no longer needed to select, manage, and oversee dozens of hedge fund and private equity investments.

The Advisor Agreement renewed on an annual basis, so the Outside Directors could have lowered the fee. Instead, the Outside Directors allowed the Advisor Agreement to renew on the same terms. As a result, since the Asset Sale, the Investment Manager has received $10 million for sitting on a single security that has lost 98% of its value.

The Outside Directors respond that no fee reduction was necessary because the Advisor Agreement ties the dollar amount of the Annual Fee to AUM. Thus, as AUM plummeted, so did the fee. But that response misconstrues the YWCA's claim. The

---

[111] Answering Brief at 34.

YWCA argues that paying 1% of AUM was too high a rate once the Investment Manager's responsibilities decreased dramatically.

An analogy helps frame the two sides' positions. Envision a real estate manager responsible for a botanical wonder similar to the Mount Cuba Center's gardens. The manager would need a team of highly trained horticulturalists who warranted an hourly wage commensurate with their expertise and experience. For those horticulturalists, maintaining the diverse gardens would be a full-time job. Now assume that the manager sells the gardens and invests all of the proceeds in vacant land. The manager no longer needs a full-time team of highly trained horticulturalists. The manager likely no longer needs expert horticulturalists at all. The manager could make do with a run-of-the-mill commercial landscaping firm that would charge a lower hourly rate.

The Outside Directors' argument equates to the assertion that if the highly trained horticulturalists worked fewer hours weed whacking the vacant land, then that would be savings enough. The YWCA argues that in that situation, loyal directors would no longer rely on highly trained horticulturalists, but if they did, they would adjust their compensation to reflect that those horticulturalists were engaged in tasks that any run-of-the-mill commercial landscaper could do.

In virtually all settings, the business judgment rule protects those types of hiring and compensation decisions. But some transactions are so extreme on their

face as to suggest some form of fiduciary misconduct.[112] Here, the Outside Directors allowed the Master Fund to pay the Investment Manager $10 million since the Asset Sale, and during that time the Investment Manager only had to monitor a single investment. Not only that, but the Investment Manager has done nothing with the investment. That's a lot of money for zero activity.

When presented with a disparity this great, a court can justifiably infer that matters may be amiss sufficient to warrant proceeding past the pleading stage.[113] In the corporate context, the vehicle for such a claim can be waste.[114] That claim

---

[112] *See In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at *12 (Del. Ch. Aug. 8, 1988) (explaining that "[r]arely will direct evidence of bad faith—admissions or evidence of conspiracy—be available" and that courts may need to "look imaginatively beneath the surface of events, which, in most instances, will itself be well-crafted and unobjectionable" in stockholder class actions); *see also In re Engagesmart*, 2026 WL 554442, at *30 ("Allegations of bad faith do not require a smoking gun."); *In re Fitbit, Inc. S'holder Deriv. Litig.*, 2018 WL 6587159, at *15 (Del. Ch. Dec. 14, 2018) (same).

[113] *See IBEW Loc. Union 481 Defined Contribution Plan & Tr. on Behalf of GoDaddy, Inc. v. Winborne*, 301 A.3d 596, 621 (Del. Ch. 2023).

[114] *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 138 (Del. Ch. 2009) (inferring at pleading-stage that CEO's compensation package could be waste); *see also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 784 (Del. Ch. 2016) (drawing inference of waste for executive compensation package), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019) (addressing presumption of confidentiality).

manifests as a form of bad faith[115] and hence is non-exculpable under the DGCL.[116] In situations when there are no other pled facts that could provide any reasonably conceivable basis to infer that a fiduciary could have acted for an improper purpose, the court can *only* evaluate the merits of the decision that the fiduciaries made.[117] If the decision is sufficiently extreme, then the court can infer bad faith, but the decision must be so extreme that it could not be rationally explained on another basis.[118]

Because the LP Agreement preserves liability for a breach of the duty of care,[119] the YWCA has not argued bad faith. The YWCA has sought to invoke the lower gross negligence standard and argued that the Outside Directors acted recklessly by knowingly permitting the Investment Manager to continue to reap the Annual Fee while doing nothing.

---

[115] Although waste historically was viewed as a type of ultra vires act that was beyond a fiduciary's power to take, contemporary Delaware authorities have integrated the concept into the business judgment rule as a means of pleading bad faith. *See In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d 652, 693–94 (Del. Ch. 2023) (collecting cases).

[116] *See* 8 *Del. C.* § 102(b)(7).

[117] *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 780–81 (Del. Ch. 1988) ("A court may, however, review the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.") (internal citation omitted).

[118] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 34 (Del. Ch. 2014).

[119] *See* LPA § 3.9(a).

If that were all the Complaint alleged, then the business judgment rule would likely still apply. But when a plaintiff advances this type of argument, contextual factors may reinforce a court's concerns. Here, three of the four Outside Directors have been with the Master Fund since its inception in 2003. Mann has been a Director since March 2013. Combined, the four Outside Directors have served for eighty-eight years on the boards of nine different funds created and managed by Perkins and the Investment Manager. They also could expect to serve on new funds that Perkins and the Investment Manager formed.[120] Regardless of whether those interests would be sufficient to call into question the independence of the Outside Directors, they suggest a reason why the Outside Directors may have turned a blind eye to the incongruity of paying the Investment Manager $10 million to oversee a single position.

The allegations about the Annual Fee also do not stand alone. They are part of a Complaint that also pleads claims regarding the Asset Sale and the Dissolution Plan. The Complaint as a whole depicts Outside Directors who have been asleep at the switch.

The Outside Directors try to argue that the Investment Manager has been doing things, but that response would require drawing a defendant-friendly inference

---

[120] *See Goldstein v. Denner*, 2022 WL 1671006, at *48 (Del. Ch. May 26, 2022) (discussing implications of future positions for independence); Jared A. Ellias et. al., *The Rise of Bankruptcy Directors*, 95 S. Cal. L. Rev. 1083, 1095–98, 1128, 1136 (2022) (same); Da Lin, *Beyond Beholden*, 44 J. Corp. L. 515, 525–26, 531–50 (2019) (same).

at the pleading stage. The activities the Outside Directors cite are also weak tea. They highlight the extreme disparity between the compensation and the task.

The act of paying $10 million under these circumstances is sufficiently concerning to permit the plaintiff to conduct discovery. This aspect of Count I survives pleading-stage review.

### 4. Exculpation

Analyzing the claim for breach of fiduciary duty requires addressing yet one more issue: exculpation. The LP Act authorizes a partnership agreement to exculpate members, managers, and other persons from money damages by "provid[ing] for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties)."[121] The LP Agreement addresses exculpation in the following provision:

> The Directors, the Investment Manager and the General Partner, including any officer, director, Partner, member, principal, employee or agent of any of them, will not be liable to the Partnership or to any of its Partners for any loss or damage occasioned by any act or omission in the performance of the Person's services under this Agreement, in the absence of a final judicial decision on the merits . . . that the loss is due to an act or omission of the Person constituting willful misfeasance, bad

---

[121] 6 *Del. C.* § 17-1101(f) ("A partnership agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a partner or other person to a limited partnership or to another partner or to another person that is a party to or is otherwise bound by a partnership agreement; provided, that a partnership agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.").

faith, gross negligence, or reckless disregard of the Person's duties under this Agreement.[122]

The LP Agreement thus preserves liability not only for willful misfeasance and bad faith, but also for "gross negligence, or reckless disregard of the Person's duties under this Agreement." The 1940 Act drives that result: That statute does not permit registered investment companies to eliminate the duty of care or provide exculpation for its breach.[123]

By preserving liability for gross negligence, the LP Agreement preserves liability for a breach of the duty of care.[124] Count I therefore states non-exculpated claims against the Outside Directors.

---

[122] LPA § 3.9(a).

[123] *See* 15 U.S.C. § 80(a)-17(h) ("After one year from the effective date of this subchapter, neither the charter, certificate of incorporation, articles of association, indenture of trust, nor the by-laws of any registered investment company, nor any other instrument pursuant to which such a company is organized or administered, shall contain any provision which protects or purports to protect any director or officer of such company against any liability to the company or to its security holders to which he would otherwise be subject by reason of willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his office.").

[124] From a contractarian standpoint, the decision to preserve liability for both gross negligence and recklessness arguably contemplates a distinction between the two. A court strives to give meaning to every term in an agreement. *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd,* 945 A.2d 594 (Del. 2008); *Majkowski v. American Imaging Mgmt. Serv.*, 913 A.2d 572, 588 (Del. Ch. 2006) (explain that courts "attempt to interpret each word or phrase in a contract to have an independent meaning so as to avoid rendering contractual language mere surplusage"). *See Star*

**B.    Count VI: Aiding And Abetting Breach Of Fiduciary Duty**

Count VI asserts that the Buyer and its CEO, Heppner, aided and abetted the sell-side defendants in breaching their fiduciary duties. According to the Complaint, the Buyer and Heppner promised to provide the Investment Manager with seed capital for new funds. Count VI pleads a claim against the Buyer but not against Heppner.

**1.    The Elements Of An Aiding And Abetting Claim**

"A claim for aiding and abetting has four elements: (1) the existence of a fiduciary relationship, (2) a breach of fiduciary duty, (3) knowing participation in that breach, and (4) damages proximately caused by the breach."[125] "[A] claim for aiding

---

*Am. Rail HoldCo, LLC v. Cathcart*, 2024 WL 5239938, at *9 (Del. Ch. Dec. 17, 2024) (adopting as the only reasonable interpretation of a contract the reading that "gives meaning and effect to each of the contract's terms"). *See generally* Restatement (Second) of Contracts § 203 ("In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable: (a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect . . ."); *id.* cmt. b ("Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous."). And because the liability-preserving language implements a section of the 1940 Act that forbids the elimination of liability for "gross negligence," the answer could turn on what that statute contemplates the term to mean. Perhaps gross negligence for purposes of the LP Agreement really is just "a higher level of negligence representing an extreme departure from the ordinary standard of care." *Browne*, 583 A.2d at 953 (cleaned up). Happily, this decision need not ponder those questions, because the claims survive under a traditional approach.

[125] *Engagesmart*, 2026 WL 554442, at *35 (citing *Malpiede*, 780 A.2d at 1096).

66

and abetting often turns on meeting the 'knowing participation' element."[126] The "knowing participation" element "involves two concepts: knowledge and participation."[127]

There are two dimensions to the knowledge concept.[128] First, the secondary actor must know that the primary wrongdoer's conduct constituted a breach.[129] Second, the secondary actor must know that its own participation in the wrongful conduct was legally improper.[130] The secondary actor's conduct need not be wrongful or tortious in its own right, but the secondary actor must know that it was acting wrongfully by participating.[131]

---

[126] *Buttonwood Tree Value P'rs, L.P. v. R. L. Polk & Co., Inc.*, 2017 WL 3172722, at *9 (Del. Ch. July 24, 2017).

[127] *Presidio*, 251 A.3d at 275.

[128] *RBC Cap. Mkts.*, 129 A.3d at 861–62.

[129] *Id.*; *accord Malpiede*, 780 A.2d at 1097 ("Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach.").

[130] *RBC Cap. Mkts.*, 129 A.3d at 862.

[131] *New Enter. Assocs. 14, L.P. v. Rich* (*NEA I*), 292 A.3d 112, 176 (Del. Ch. 2023) ("The aider and abettor must knowingly assist another in committing a wrongful act. The means by which an aider and abettor provides assistance need not be independently wrongful."); *e.g.*, *Firefighters' Pension Sys. of City of Kansas City v. Found. Bldg. Mat'ls, Inc.*, 318 A.3d 1105, 1171 (Del. Ch. 2024) ("The plaintiff has not pled that RBC took action that was independently wrongful, but that is not required. . . . RBC worked closely with the Lone Star-affiliated directors to secure proposals that included a maximum Early Termination Payment. RBC played an integral part in the effort to sell the Company through a transaction that would trigger the Early Termination Payment. The complaint states a claim against RBC for aiding and abetting that alleged breach.").

"Because the involvement of secondary actors in tortious conduct can take a variety of forms that can differ vastly in their magnitude, effect, and consequential culpability," the participation concept "requires that the secondary actor have provided 'substantial assistance' to the primary violator."[132] To assess substantial assistance, Delaware law applies a five-factor test derived from Section 876 of the *Restatement (Second) of Torts*. "That framework calls for considering (1) the nature of the act encouraged, (2) the amount of assistance given by the defendant, (3) his presence or absence at the time of the tort, (4) his relation to the other, and (5) his state of mind."[133]

Two recent Delaware Supreme Court decisions made the knowing participation element tougher for both knowledge and participation. In *Columbia Pipeline*, the justices held that the aider and abettor's knowledge "must be actual knowledge," not the lower bar of reckless indifference.[134] In *Mindbody* and *Columbia*

---

[132] *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 27, 2015).

[133] *Engagesmart,* 2026 WL 554442, at *35 (citing *Dole*, 2015 WL 5052214 at *42); *accord In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 395–96 (Del. 2024).

[134] *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 342 A.3d 324, 368 (Del. 2025). The justices defined "actual knowledge" as "'clear and direct knowledge.'" *Id.* at 356 & n.194 (quoting *Deutsche Bank Nat'l Tr. Co. v. Goldfeder*, 86 A.3d 1118 (Del. 2014) (TABLE) ("Actual knowledge is defined as direct and clear knowledge. Constructive knowledge is defined as knowledge that one using reasonable care and diligence should have, and therefore that is attributed by law to a given person." (cleaned up)). Under *RBC Capital*, constructive knowledge was enough. *RBC Cap. Mkts.*, 129 A.3d at 862 ("To establish scienter, the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was

*Pipeline*, the justices limited what qualifies as "substantial assistance." At least for a third-party acquirer, the plaintiff must plead or prove affirmative conduct,[135] and the conscious failure to act in the face of a known duty to act is not sufficient.[136] Thus, "[a]t the pleading stage, a complaint must contain factual allegations supporting a reasonable inference that the aider and abettor actually knew that the primary violator's conduct was a fiduciary breach, actually knew that its own conduct was legally improper (even if not inherently illegal), and actively participated in the primary violator's misconduct."[137]

---

legally improper." (internal quotation marks omitted)); *id.* (explaining that the aider and abettor must act "knowingly, intentionally, or with reckless indifference" (cleaned up)). In the transition from *Mindbody* to *Columbia Pipeline*, the justices also seem to have wanted more to support a finding of knowledge. *Compare Mindbody*, 332 A.3d at 397–98 ("[T]he record, particularly as to the November 6 and November 10 tips, supports the conclusion that Vista likely knew that the conduct of the primary violator, Stollmeyer, constituted a breach. This knowledge satisfies the first type of required knowledge for a finding of *scienter*.") *with Columbia Pipeline*, 342 A.3d at 357 n.198 (rejecting as insufficient trial court's finding that "The plaintiffs proved that TransCanada knew that Skaggs and Smith were engaging in a breach of the duty of loyalty and that the Board was failing to provide meaningful oversight.").

[135] *Mindbody*, 332 A.3d at 403 & n.137 (holding that a failure to act is insufficient absent an independent duty between the alleged aider and abettor and the plaintiff)*; Columbia Pipeline*, 342 A.3d at 369 (discussing and adopting the "affirmative action" requirement in *Mindbody*).

[136] It is not clear how the active participation requirement from *Columbia Pipeline* and *Mindbody* applies to aiders and abettors other than third-party acquirers. Other aiders and abettors, such as sell-side advisors, are differently situated. Read broadly, the requirement would overrule much of the analysis in *RBC Capital*, which rested on a financial advisor withholding information that it was under a duty to provide. *Engagesmart*, 2026 WL 554442, at *41.

[137] *Id.* at *35; *accord Calumet Cap. P'rs*, 2026 WL 246995, at *17.

69

For purposes of a motion to dismiss under Rule 12(b)(6), a complaint need only plead facts supporting a reasonable inference of knowledge.[138] Under Rule 9(b), a plaintiff can plead knowledge generally; "there is no requirement that knowing participation be pled with particularity."[139] To plead participation, a plaintiff can plead that the advisor "participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue."[140] But "'[c]onclusory statements that are devoid of factual details to support an allegation of knowing participation will fall short of the pleading requirement needed to survive a Rule 12(b)(6) motion to dismiss.'"[141]

## 2. Knowing Participation In Perkins And The Investment Manager's Breach

There are two groups of actors whose sell-side breach could support a claim for aiding and abetting. One group comprises Perkins and the Investment Manager. They did not move to dismiss the breach of fiduciary duty claim under Rule 12(b)(6), so this decision would not otherwise need to address it. But the claim is a

---

[138] *See Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *17 (Del. Ch. June 30, 2014).

[139] *Id.*

[140] *Malpiede*, 780 A.2d at 1098.

[141] *Jacobs v. Meghji*, 2020 WL 5951410, at *7 (Del. Ch. Oct. 8, 2020) (quoting *McGowan v. Ferro*, 2002 WL 77712, at *2 (Del. Ch. Jan. 11, 2002)).

straightforward one for breach of the duty of loyalty, and it is reasonably conceivable that the Buyer knowingly participated in their breach of the duty of loyalty.

Perkins is one of the Directors. Under the LP Agreement, he owes the same duties as a director of a Delaware corporation. Those duties include a duty of loyalty.

A plaintiff can recover monetary damages for a breach of the duty by pleading and later proving that the fiduciary "harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party . . ., or [otherwise] acted in bad faith."[142] The Complaint alleges that the Buyer promised to support Perkins and the Investment Manager financially in their efforts to start new funds.[143] As a result of that commitment, Perkins and the Investment Manager harbored a self-interest contrary to the interests of the Master Fund and its investors.

Even after *Columbia Pipeline*, an acquirer can aid and abet a breach of the duty of loyalty by "creat[ing] the condition giving rise to the conflict of interest."[144] "[A]lthough an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations with the target's board, it may not knowingly

---

[142] *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1180 (Del. 2015); *see Tangoe Inc. S'holders Litig.*, 2018 WL 6074435, at *12 (Del. Ch. Nov. 20, 2018); *Venhill Ltd. P'ship ex rel. Stallkamp*, 2008 WL 2270488, at *22 (Del. Ch. June 3, 2008); *McMillan*, 768 A.2d at 502.

[143] Compl. ¶¶ 5, 69, 87, 158.

[144] *Columbia Pipeline*, 342 A.3d at 361.

71

participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders."[145]

In *USACafes*, Chancellor Allen dealt with a similar allegation. An acquirer allegedly offered financial incentives to the general partner to cause them to disregard their duties to the limited partnership.[146] That was sufficient to support a claim for aiding and abetting against the Buyer. The same is true here, even under the more stringent standard.

The Buyer understandably argues that the assertion about the side deal is conclusory, and that is true. But while this court need not credit conclusory allegations, a court must take into account the extent to which information is in the defendants' exclusive control.[147] If a plaintiff has no ability to access more detailed information, then requiring more detailed pleadings risks closing the courthouse

---

[145] *Malpiede*, 780 A.2d at 1097.

[146] *USACafes,* 600 A.2d at 56.

[147] *E.g.*, *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 881 (11th Cir. 2003) ("Courts typically allow the pleader an extra modicum of leeway where the information supporting the complainant's case is under the exclusive control of the defendant."); *United States ex rel. Russell v. Epic Healthcare Mgmt. Gp.*, 193 F.3d 304, 308 (5th Cir. 1999) ("We have held that when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the Rule 9(b) standard is relaxed . . . ."); *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994) ("Specificity requirements may be relaxed, of course, when the details are within the defendant's exclusive knowledge."); *Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 709 (D.N.J. 2013) (explaining that courts apply the Rule 9(b) particularity standard more strictly when "information is not within the exclusive control of a defendant" and take a "more relaxed" approach when the defendant has exclusive control of the information).

doors to a plaintiff that is truly injured.[148] It is one thing to expect plaintiffs to use

the tools at hand when the tools are accessible. It is another thing to require plaintiffs

to plead as if they had access to the tools at hand when they don't.[149]  If a plaintiff

has used the limited information it can access to plead allegations that support a

reasonably conceivable claim in a setting involving a highly asymmetric balance of

information, more pleading-stage specificity should not be required.[150] A court can

---

[148] *In re Plasma-Deriv. Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1002 n.10 (N.D. Ill. 2011) ("If private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available data."); *accord In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 544, 550 (M.D. Tenn. 2023); *see In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017).

[149] *See Inv. Bancorp, Inc. v. Albanese*, 2020 WL 1929169, at *8 (Del. Ch. Apr. 21, 2020) ("[C]ontext matters when assessing the adequacy of particularized pleading. No rational pleading standard can require a plaintiff to plead specific facts that he has no means to know."); *accord Moran v. Unation, Inc.*, 2025 WL 3706330, at *25 n.182 (Del. Ch. Dec. 22, 2025); *see also Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1040 (7th Cir. 1996) ("Rule 9(b) does not require plaintiffs to plead facts to which they lack access prior to discovery."); *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) (holding that Rule 9(b) only "requires that plaintiffs specifically plead those facts surrounding alleged acts of fraud to which they can reasonably be expected to have access").

[150] *See In re Wolf*, 64 B.R. 725, 753 (N.D. Ill. Bankr. 2022) (explaining that "Rule 9(b) does not require plaintiffs to plead facts to which they lack access prior to discovery . . . . Courts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail.") (internal citations omitted); *In re Universal Mktg., Inc.*, 460 B.R. 828, 835 (E.D. Pa. Bankr. 2011) ("When the evidence relevant to a claim is not in the control of a plaintiff, there is a seeming catch-22 between the need to plead certain facts before getting discovery, and the need to get discovery before having certain facts.") (internal citations omitted); *see also Inv. Bancorp*, 2020 WL 1929169, at *9 ("[A] derivative plaintiff rarely has access, pre-discovery, to the facts that would allow him to recount a fly-on-the-wall's perspective of the alleged

exercise its case management authority to allow limited discovery and test critical allegations before permitting full-blown litigation to proceed.

Here, the informational asymmetry is high. The YWCA has relied on the letters it received from the Investment Manager and the limited public information that is available. Together, they depict a highly questionable transaction. At the same time, the structure of the fund complex took away any meaningful access to information beyond those sources. The defendants fault the YWCA for not using Section 220 of the Delaware General Corporation Law,[151] ignoring the fact that the Feeder Funds and the Master Fund are not Delaware corporations.

To be sure, the LP Act contains its own books and records provision,[152] but in contrast to Section 220, nothing in the LP Act provision explicitly gives a limited partner access to information beyond the partnership in which the limited partner holds an interest. In other words, the LP Act does not provide an express basis for the YWCA to access the Master Fund's books and records as a Feeder Fund investor. The LP Act also makes access "subject to such reasonable standards (including standards

---

fiduciary misconduct he is attempting to plead."); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011) (discussing the heightened Rule 9(b) standard and explaining that "courts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail" but noting that "[t]he grounds for the plaintiff's suspicions must make the allegations *plausible*").

[151] 8 *Del. C.* § 220.

[152] 6 *Del. C.* § 17-305.

governing what information (including books, records and other documents) is to be furnished, at what time and location and at whose expense) as may be set forth in the partnership agreement or otherwise established by the general partners"[153] and authorizes a general partner

> to keep confidential from limited partners for such period of time as the general partner deems reasonable, any information which the general partner reasonably believes to be in the nature of trade secrets or other information the disclosure of which the general partner in good faith believes is not in the best interest of the limited partnership or could damage the limited partnership or its business or which the limited partnership is required by law or by agreement with a third party to keep confidential.[154]

The LP Agreement does not give the limited partners any greater rights.[155] The Prospectus indicates that investors have no meaningful ability to access books and records at the Master Fund level and must content themselves with the Master Fund's annual and semi-annual reports.

That means the YWCA had no way to access the basic documents governing the Asset Sale. The YWCA cannot plead more than it has because it does not have access to more information. The proper approach in this setting is to permit the claim to survive the pleading stage, but limit discovery so that the court can test the core allegation of a side deal before the case proceeds to full-blown litigation. The court

---

[153] *Id.* § 17-305(a).

[154] *Id.* § 17-305(b).

[155] *See* LPA § 8.10(a).

75

will not attempt to set those boundaries now; the parties should make the initial attempt.

The Complaint therefore states a claim for aiding and abetting against the Buyer. The YWCA has also named Heppner as a defendant, but the Complaint does not contain allegations sufficient to implicate him. It seems logical that he would have made the promise to support the Investment Manager's future funds, but the Complaint does not make that allegation. The claim against Heppner is therefore dismissed.

### 3. Knowing Participation In The Outside Directors' Breach

The other group of actors whose sell-side breach could support a claim for aiding and abetting comprises the Outside Directors. This decision has already decided that the Complaint pleads a claim against the Outside Directors for breach of the duty of care when approving the Asset Sale and arguably a claim for taking that action in bad faith. But it is not reasonably conceivable that the Buyer aided and abetted that breach. Under *Columbia Pipeline*, "a bidder who has not colluded or conspired with its negotiating counterpart, who does not create the condition giving rise to a conflict of interest, who does not encourage his counterpart to disregard his fiduciary duties or substantially assist him in committing the breach, does not aid and abet the breach."[156] The Complaint does not contain any allegations suggesting that the Buyer or Heppner contributed to the Outside Directors' breach.

---

[156] *Columbia Pipeline*, 342 A.3d at 361.

## C.    Count VII: Unjust Enrichment

Count VII asserts that Heppner and the Buyer were unjustly enriched by the Asset Sale and the subsequent conversion of Preferred Units into common stock. This claim survives against the Buyer but not against Heppner.

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[157] The elements of a claim for unjust enrichment are "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, [and] (4) the absence of justification."[158] "Where an

---

[157] *Windsor I, LLC v. CWCap. Asset Mgmt. LLC*, 238 A.3d 863, 875 (Del. 2020) (internal quotation marks omitted).

[158] *See Garfield v. Allen*, 277 A.3d 296, 341 (Del. Ch. 2022). In *Monsanto*, the Delaware Supreme Court agreed with *Garfield* that "the absence of a remedy provided by law" is not a standalone element of an unjust enrichment claim. *State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 391 & n.115 (Del. 2023). That issue only becomes pertinent if a party challenges the Court of Chancery's jurisdiction to hear an unjust enrichment claim, in which case showing the absence of a remedy at law becomes critical for establishing equitable jurisdiction. *See* 10 *Del. C.* § 342 ("The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State."). In that respect, *Monsanto* abrogates earlier cases that appeared to require that a plaintiff establish the absence of a remedy at law as part of the basic claim for unjust enrichment, even when equitable jurisdiction was not at issue. Cases reflecting that errant formulation and abrogated in part by *Monsanto* include *Wells Fargo Bank, N.A. v. Estate of Malkin*, 278 A.3d 53, 69 (Del. 2022) (describing the elements of an unjust enrichment claim as "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law"); *Nemec*, 991 A.2d at 1130 (same); *Jackson National Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999) (same); and *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998) (same).

investor is only alleged to have participated in a transaction without any knowledge of wrongdoing, its bargained-for benefit is justified, barring circumstances that would render the benefit unconscionable."[159]

Here, the unjust enrichment claim turns on whether the Buyer received too good a deal in the Asset Sale. A third party is entitled to bargain in its own self-interest, so absent some type of wrongdoing, obtaining good terms—even extremely good terms—is not unjust.[160]

As the source of injustice, the YWCA points to the same alleged misconduct underlying the aiding and abetting claim. The YWCA again claims that the Buyer exploited the Investment Manager's conflict of interest by offering a side deal. The unjust enrichment claim therefore survives to the same degree as the aiding and abetting claim.

---

[159] *Jacobs*, 2020 WL 5951410, at *1; *see also Principal Growth Strategies, LLC v. AGH Parent LLC*, 2024 WL 274246, at *13 (Del. Ch. Jan. 25, 2024) ("[T]he claim for unjust enrichment often adds little and could be duplicative or unnecessary.").

[160] *See Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *24 (Del. Ch. Dec. 30, 1991) ("Generally speaking, contracting parties are, to a large extent, entitled to act selfishly to promote their own interests . . . ."); *Skye Mineral Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *30 n.372 (citing *Malpiede*, 780 A.2d at 1097) ("A . . . contractual counter-party is entitled to negotiate in furtherance of its self-interest without facing aiding and abetting liability."); *see also In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 448 (Del. Ch. 2012) (explaining that the a buyer could not be culpable as an aider and abettor because "[i]t bargained hard, as it was entitled to do.").

A plaintiff often pleads unjust enrichment as a "fallback claim."[161] It is unlikely that the unjust enrichment claim will have any work to do, but it survives Rule 12(b)(6).

### III.   CONCLUSION

Except for the claims against Heppner, the Rule 12(b)(6) motion is denied. As to the claims against Heppner, the motion is granted.

---

[161] *Voigt v. Metcalf*, 2020 WL 614999, at \*28 (Del. Ch. Feb. 10, 2020); *accord Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at \*10 (Del. Ch. Apr. 14, 2017) (referring to unjust enrichment as a "fallback count").